Standley James GODINE, Appellant,

v.

The STATE of Texas, Appellee.

No. B14–92–00812–CR.

Court of Appeals of Texas, Houston (14th Dist.).

March 24, 1994.

Ellis C. McCullough, Houston, for appellant.

Mary Lou Keel, Houston, for appellee.

Before SEARS, LEE and ROBERT E. MORSE, Jr., Assigned, JJ.

## OPINION

ROBERT E. MORSE, Jr., Justice (Assigned).

This is an appeal of a conviction for aggravated assault on a peace officer. Appellant Godine complains of an inadequate amount of time for voir dire and *Batson* error. We affirm.

Since there is no challenge to the sufficiency of the evidence, we only briefly summarize the facts in the light most favorable to the verdict. On or about April 8, 1992, Godine was seen stealing some aluminum cylinders containing propane gas. Chased by civilians and police, Godine ran into a grassy field and hid. When Officer Russell Miller found Godine, Godine sprung from the grass at Miller, knocking Miller to the ground. The chase resumed. The police eventually subdued Godine and placed him under arrest.

## I. Time Limit on Voir Dire

In point of error one, Godine complains that the trial court erred in imposing an arbitrary time limit on defense counsel during voir dire. Godine argues that he was prevented from asking proper questions of the veniremen in order to intelligently use his peremptory challenges.

### A. Standard of Review

■ The purposes of voir dire are to (1) develop rapport between the officers of the court and the jurors, (2) expose juror bias or interest warranting challenge for cause, and (3) elicit information necessary to the intelligent use of peremptory challenges. The standard of review where a defendant claims he was improperly restricted on voir dire is whether the trial court abused its discretion. *McCarter v. State,* 837 S.W.2d 117, 119 (Tex. Crim.App.1992). A two-part test applies when a party complains of an inability to address proper questions to the whole venire panel: (1) whether the complaining party attempted to prolong the voir dire, and (2) whether the questions that the party was not permitted to ask were proper voir dire questions. *Id.* at 119, 120. A third prong is added when a party is not permitted to ask questions of individual jurors: (3) Whether the party was not permitted to examine prospective jurors who actually served on the jury. *Id.*

### B. Analysis

#### 1. The Proposed "Questions"

The trial court limited each side to a 30–minute voir dire. When defense counsel

reached the end of his allotted time, he first requested additional time to question five jurors who had previously indicated that they had had a negative experience with a black male (Godine was black). The trial court did not allow further questioning but instead asked defense counsel if he wanted to challenge those jurors for cause. Counsel said that he did, and the trial court granted counsel's motion to strike all five.

Defense counsel resumed his request for more time:

Number two, to find out if they are any member of any organization such as MADD, 100 Club, or any other type of pro-law enforcement organizations.

Number three, to inquire of the jury how they feel about self-defense and whether a person has the right to defend himself against excessive force.

And number four, question about the—specific questions to individual jurors about bodily injury and their definition and what their thoughts are on bodily injury.

Also to ask specific questions about burdens of proof beyond a reasonable doubt and specific questions to some of the jurors that have relatives in law enforcement on their opinion of the right to remain silent.

And also propounding questions of the definition of beyond a reasonable doubt to the jurors and see if they understand it, if they have any quarrels with them, the specific questions to each individual juror about a defendant's failure to testify and specific questions to jurors about whether they would require any evidence to be propounded by the defendant, specifically targeting the jurors that have law enforcement relatives, and also to educate the jury about the objections that might be done in the three-step procedure that I have to take in order to preserve error.

\* \* \* \* \* \*

And also specific questions to the jurors whether they believe that—whether the criminal justice system favors the accused.

Also specific questions to the jurors whether they believe—whether their attitude has changed after the Rodney King verdict.

The trial court denied Godine's request.

## 2. Did Godine Preserve Error?

The trial court can restrict substantially repetitious or vexatious questions, questions asked in improper form, or questions directed at personal habits of jurors. *McCarter*, 837 S.W.2d at 120.

Because this Court applies the abuse of discretion standard ... for deciding appeals concerning the *manner* of voir dire, it is essential that the record present this Court with a question which the trial judge has not allowed to be answered. If counsel refrains ... from asking a question, the judge is denied the opportunity to make a ruling. Thus, we are unable to review the correctness of a ruling which was never made.

*Caldwell v. State*, 818 S.W.2d 790, 794 (Tex. Crim.App.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1684, 118 L.Ed.2d 399 (1992), quoting *Cockrum v. State*, 758 S.W.2d 577, 584 (Tex.Crim.App.1988), *cert. denied*, 489 U.S. 1072, 109 S.Ct. 1358, 103 L.Ed.2d 825 (1989) (emphasis in *Cockrum* ).

"[T]here must be a question before there can be a proper question.... Having never framed a question, Appellant has preserved nothing for this Court to review. Consequently, we must leave the trial judge's ruling undisturbed." *Caldwell*, 818 S.W.2d at 794; *see also Nunfio v. State*, 808 S.W.2d 482, 484 & 484 n. 1 (Tex.Crim.App.1991) (specific ruling as to a specific question properly preserved issue for review) *and Tobar v. State*, 833 S.W.2d 296, 298 n. 1 (Tex.App.—Corpus Christi 1992), *rev'd on other grounds*, 850 S.W.2d 182 (1993) (appellant properly preserved error by making a bill of exceptions of three questions); *but see McCarter*, 837 S.W.2d at 118, 122 ("questions" were proper even though defense attorney formulated no questions but identified only topics for potential questions; however, the State did not challenge this failure).

■ Godine merely narrated a series of topics he wanted to investigate further. A

trial court should not be expected to separate the wheat from the chaff, cull out potentially valid subject matters from overly broad topic descriptions, and anticipate the form in which a specific question emanating from a topic will be asked. To preserve error, it behooved Godine to (1) present to the trial court specific questions formulated in the manner they were to be asked, and (2) obtain an adverse ruling. *See Caldwell,* 818 S.W.2d at 794. Godine failed to present the trial court with information in a format suitable for efficient judicial review. Godine thereby failed to preserve error.

### 3. Were the Questions that Godine was not Permitted to Ask Proper Voir Dire Questions?

Even assuming that Godine's narration of topics preserved error, we would find that most of Godine's proposed "questions" were not "proper questions."

Several questions were too broad:

A "proper" question is one that seeks to discover a venireperson's views on an issue applicable to the case.... However, a voir dire question that is so broad in nature as to constitute a "global fishing expedition" is not proper and may be prevented by the trial judge.... Potentially, a wide range of specific questions—both proper and improper—could have been asked within this general subject area. Given the broad nature of this request, it is impossible for this Court to determine whether the inquiry of Appellant would have been proper—i.e., both appropriately phrased and relevant. Unable to make this determination, this Court cannot find that the trial court abused its discretion in refusing Appellant's request for additional time.

*Caldwell,* 818 S.W.2d at 794 (citations and footnote omitted).

■ Godine's wanted to question jurors on "how they feel" about self-defense, on "what their thoughts are" on bodily injury, "if they have any quarrels" with the definition of beyond a reasonable doubt, "whether they believe" the criminal justice system favors the accused, and whether their "attitude" has changed after the Rodney King verdict. The

scope of these inquiries is too broad for effective use of the not unlimited time available for voir dire. *See Bowser v. State,* 865 S.W.2d 482, 485 (Tex.App.—Corpus Christi 1993, no pet.) (inquiry into "thoughts" and "observations" too open-ended to constitute proper questions for voir dire); *see also Smith v. State,* 703 S.W.2d 641, 645 (Tex. Crim.App.1975) (trial court has discretion to prevent a "global fishing exhibition").

■ Another proposed area of inquiry was substantially repetitious. Godine's counsel spent nearly half of his allotted voir dire time questioning jurors on their family ties or other personal relationships with law enforcement personnel. The thrust of that questioning was to determine which jurors were pro-law enforcement. Twelve jurors responded, and Godine was allowed but ten peremptory strikes. The additional information to be gleaned regarding juror involvement with certain pro-law enforcement organizations would appear to have had marginal utility.

### 4. Was Godine not Permitted to Examine Prospective Jurors Who Actually Served on the Jury?

Godine wanted to ask jurors who had relatives in law enforcement regarding Godine's right to remain silent and whether the jurors would require Godine to propound any evidence. But the record does not show that any of the jurors who indicated that they had relatives in law enforcement actually served on the jury. In fact, the record positively establishes that of the eight jurors who said they had relatives in law enforcement, six where struck by Godine either for cause or by peremptory strike. The record did not positively reflect that the remaining two jurors made it to the final twelve.

### 5. Did Godine Attempt to Prolong the Voir Dire?

■ Finally, Godine wanted to educate the jury on the three-step procedure necessary to preserve error. We find that Godine could have accomplished this had he effectively budgeted his voir time.

At the beginning of the State's voir dire, the prosecutor emphasized that the time for voir dire was limited. She exhorted the veniremembers to be on their toes and answer promptly: "... I don't have very much time to talk to you this afternoon, and we have a lot of area to cover about this case.... [I]t's real important that I get your answers and get them quickly so I can move on to the next area so we can cover as much as possible." In contrast, defense counsel began his voir dire: "Ladies and gentlemen of the jury, I want to hear from you. I want to hear opinions that you might have on this case." He did not voice to the jury any concern about time. The State was able to fill 35 pages of record in its allotted 30 minutes, Godine only 27.

Very early in his voir dire, Godine's counsel stated to the jury:

> Let me understand this: If a police officer gets up on the stand and testifies—we're not—I'm not talking about this case—testifies that somebody slapped him on the shoulder and he experienced some pain, all of you have qualified—have said that you believe that you could consider life imprisonment; is that correct? Because I want to make sure that you understand that the charge doesn't change that. *We're talking about priors. I mean the charge—the injury doesn't change. Talking specifically as to injury.* And you are telling me at this point that you could assess a life sentence based on pain on—not on stitches, not on bruises, not on anything that you could see, but something a police officer could come here and say, heck yeah, I experienced some pain?
>
> *  *  *  *  *  *
>
> Is that what you're telling me? Do I hear a yes or a no? Do I have a response? Let me pick on you. Is that what you're telling me?

(Emphasis added.)

Not unexpectedly, what followed was a rambling discussion with confused jurors about when the jury would know about prior convictions and whether there was a difference between prior indictments and prior convictions. This segment ended with counsel's global query: "[D]o you have any preconceived conclusions about *what this case is all about?* Anybody?" (Emphasis added.) This portion of voir dire consumed five pages of record equating to nearly 20 percent of counsel's allotted time.

Counsel consumed the last twelve pages of his voir dire (nearly 45 percent of the allotted time) questioning specific jurors on their law enforcement relatives, friends, and acquaintances.

Thus, counsel spent almost 65 percent his voir dire time in just two topic areas one of which lacked focus. "Counsel has the responsibility to appropriately budget his time within the reasonable limits set by the court." *Tobar*, 833 S.W.2d at 298.

We find that the trial court would not have abused its discretion to find that counsel unnecessarily prolonged his voir dire and wasted time that could have been used to educate the jury and perhaps even probe into other areas of inquiry.

We overrule point one.

## II. *Batson* Error

In point of error two, Godine contends that the trial court erred in overruling his *Batson* objection that the State peremptorily struck a black woman from the jury panel because of her race.

At the close of voir dire, Godine objected to the prosecutor's exercise of a peremptory strike of juror # 30, a black woman. In response, the prosecutor explained:

> [J]uror number 30 was struck because of her failure to follow directions and being able to answer the questions put to her. On the juror information sheet, she failed to answer, have you ever been accused or complainant or witness in a criminal case and she failed to answer, have you ever served on a criminal jury.
>
> The prosecutor feels there might be an inability for her to be able to follow directions and follow the charging instrument as set forth by the Court.

The failure to answer those questions either yes or no is our neutral reason.

The trial court overruled Godine's objection.

The trial court also refused Godine's request to question the prosecutor. But the party raising a *Batson* challenge must be afforded an opportunity to rebut the State's asserted race-neutral explanation. Therefore, by order dated August 19, 1993, we abated Godine's appeal and directed the trial court to conduct a new *Batson* hearing. On September 15, 1993, the same judge who presided at Godine's trial conducted the new hearing. However, nothing at the hearing caused the judge to change his original decision to overrule Godine's *Batson* objection. Having reviewed the record of that hearing, we agree with the trial court that Godine did not carry his burden to prove that the State's race-neutral reason for striking juror # 30 was pretextual.

### A. Standard of Review

■ A prosecutor is prohibited by the equal protection clause of the Fourteenth Amendment from challenging potential jurors on the basis of race. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986); TEX.CODE CRIM.PROC. ANN. art. 35.261 (Vernon 1989). In reviewing a *Batson* challenge, we must determine: (1) whether the appellant introduced sufficient evidence to establish a *prima facie* case that the State engaged in purposeful racial discrimination by the use of a peremptory strike, if so (2) whether the State sustained its burden of production by coming forward with a race-neutral explanation, and if so (3) whether appellant sustained his ultimate burden of persuasion by successfully rebutting the State's explanation. *Williams v. State*, 804 S.W.2d 95, 101 (Tex.Crim.App.1991), *cert. denied*, — U.S. —, 111 S.Ct. 2875, 115 L.Ed.2d 1038 (1991).

■ The trial court is the factfinder at a *Batson* hearing, and it is his responsibility to weigh the evidence and determine the credibility of the witnesses. *Tompkins v. State*, 774 S.W.2d 195, 202 n. 6A (Tex.Crim.App. 1987), *aff'd*, 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989). We will not disturb the trial court's ruling unless it is "clearly erroneous." *Wright v. State*, 832 S.W.2d 601, 604 (Tex.Crim.App.1992). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Whitsey v. State*, 796 S.W.2d 707, 721 (Tex.Crim.App.1989), quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

■ In *Whitsey*, the Court set out factors that may be used to determine whether a peremptory challenge was race neutral: (1) whether the State's explanation was related to the facts of the case, (2) whether there was a lack of meaningful questioning of the struck juror, (3) whether there was disparate selection of prospective jurors, i.e., were veniremembers impanelled on the jury with the same or similar characteristics as the struck juror, (4) whether there was disparate examination of a juror, i.e., questioning of a juror to evoke a particular response without asking the same questions of other panel members, and (5) whether the State's explanation was based on a group bias where the group trait was not shown to apply to the struck juror specifically. *Id.* at 713–14.

### B. Analysis

#### 1. Prima Facie Case

■ To make a *prima facie* case, the accused must show facts and circumstances raising an inference that the prosecutor used a peremptory strike to exclude a venireperson from the jury because of his race. *Linscomb v. State*, 829 S.W.2d 164, 165 (Tex. Crim.App.1992). The accused is entitled to rely on the fact that peremptory challenges permit those to discriminate who are of a mind to discriminate. *Harris v. State*, 827 S.W.2d 949, 955 (Tex.Crim.App.1992), *cert. denied*, — U.S. —, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992). In the present case, juror # 30 was an African–American, as was Godine, the defendant. The burden of proof to make the *Batson prima facie* case is not onerous, and we find that Godine met that minimal burden. *Dewberry v. State*, 776 S.W.2d 589, 591 (Tex.Crim.App.1989).

## 2. Race–Neutral Explanation & Rebuttal

At the *Batson* hearing ordered by this court, the prosecutor testified as follows:

Q: [STATE'S COUNSEL AT *BATSON* HEARING] ... [D]id the race of any prospective juror impact any decision that you made in terms of exercising peremptory strikes?

A: [GODINE'S PROSECUTOR] Absolutely not. . . . [I]t did not enter my mind. I have my juror flow chart with me that I used in that trial. In no way did I take notes or make myself aware of who was of what race or what ethnic background.

Q: As best that you can recall, how many prospective black jurors did you exercise peremptory strikes on?

A: It was just the one because that was the only one called to the Court's attention. It's just the one that is referenced in the appellate brief.

Q: In other words, one black juror was struck while three served.

A: That's correct.

Q: Can you please detail for the record why you struck the black juror. . . .

A: There are several different reasons, the most prevalent being that my fear she was not completely understanding directions and literate at the time of the voir dire. Based on her juror information card, she failed to completely fill out the boxes on both sides, both questions about having served on a jury before as well as background questions.

Additionally, she indicated that she was not or she didn't fill out her employer's phone number even though she had been employed with her particular job for four years, indicated to me she was not even aware of that phone number. Additionally, her job, the type of job she had, she was a presser at a cleaners.

There were multiple misspellings throughout her juror information sheet that led me to believe that she was not a— that she was under-educated perhaps and may have difficulty following the Court's instructions. And with my limited time frame, I used that information from the juror information card and used my peremptory strike on her.

Q: Did you ask any specific questions of [the struck juror] to indicate what type of educational background she had or try to fully develop your fears concerning her possible lack of intelligence?

A: No. I felt like that would potentially alienate other jury members to me if I started asking her about her educational level when it was obvious from her juror information sheet to me that it was not of a high level. I did not want to single her out and, additionally, with my limited time frame, I felt that was an unnecessary exercise.

Q: Did you feel there was any way that you could have even asked her questions to try to determine how intelligent she was without wanting the risk of alienating her or the other jurors?

A: No. I felt that would place her at potential ridicule in front of other juror members, additionally, making those juror members potentially hostile towards me for *singling her out with that question.*

Q: In counsel's brief he cites other jurors who did not fully complete their juror questionnaire. How did these other jury members and how did their questionnaires compare with the jury questionnaire filled out by [juror # 30].

A: . . . [Y]ou can see the scrawling handwriting. You can see the multiple misspellings. You can see the blanks left out on each side of the boxes. You can see it's not one particular thing. It's all of those things taken in totality that did not made her a juror—that made her a juror that I was not wanting to put on the jury.

Q: Did any of the other three jurors cited by counsel who did not fully complete their juror questionnaire show the same misspellings or show the same things that you indicated that you observed in [juror # 30's] jury questionnaire?

A: No, they did not. . . .

Q: Are these reasons that you cited the only reasons that entered into your factor in striking [juror # 30] from the jury?

A: Yes.

Q: And would [juror #30] have been struck if she was a member of any other racial minority group?

A: Absolutely.

Q: Would [juror #30] have been struck if she was white?

A: Yes. Absolutely.

Q: Did her race play any factor whatsoever in your decision to exercise a peremptory strike on her?

A: No factor whatsoever.

On cross-examination, the defense established that four jurors who had made various omissions on their juror information cards were impanelled on the jury. However, there was no evidence of misspellings or scrawled handwriting. The trial counsel testified for the defense and averred that two of those four jurors were white females. The record is silent on the race of the other two.

■ We note that juror information cards were not formally introduced into evidence at trial or the subsequent *Batson* hearing. However, when evidence is treated by the trial court and the parties as if it had been formally introduced, we may consider the evidence as admitted for appeal purposes. *Cornish v. State*, 848 S.W.2d 144, 145 (Tex. Crim.App.1993).

■ Godine argues that, contrary to the trial court's ruling, the evidence at the *Batson* hearing proved that the State's race-neutral explanation for striking juror #30 was a sham. We now use the *Whitsey* factors to determine if the trial court's ruling was clearly erroneous:

**(1) Was the State's explanation related to the facts of the case?** The prosecutor's explanation was based on a fundamental requirement applicable to every case, i.e., the ability of a prospective juror to follow the court's instructions and the law.

**(2) Was there a lack of meaningful questioning of the struck juror?** The prosecutor was under the same voir dire time constraint as the defense and chose to rely on juror #30's information card rather than spend valuable time confirming her initial assessment. Furthermore, the prosecutor was also legitimately concerned that questioning the juror on the juror's apparent lack of education would have subjected the juror to ridicule and possibly alienated the other jurors.

■ **(3) Was there disparate selection of prospective jurors, i.e., veniremembers, with the same or similar characteristics as the struck juror, impanelled on the jury?** "Disparate treatment" cannot automatically be imputed in every situation where one of the State's reasons for striking a venireperson would technically apply to another venireperson whom the State found acceptable. *Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993). The State's use of its peremptory challenges is not subject to rigid quantification. *Barnes v. State*, 855 S.W.2d 173, 174 (Tex.App.—Houston [14th Dist.] 1993, pet. ref'd). Potential jurors may possess the same objectionable characteristics yet in varying degrees. *Id.*

The prosecutor's testimony established the following reasons for her peremptory strike of juror #30: (1) juror #30's juror information card contained several omissions, misspellings, and scrawled writing; (2) she did not enter her employer's phone number though employed there for four years; and (3) she worked as a presser at a cleaners. The totality of the above suggested a person of low educational level or low intelligence who could have difficulty following the court's instructions and the law.

A juror's incorrect completion of a blank on a juror information form has been held to be a race-neutral reason for a peremptory strike. *Jones v. State*, 818 S.W.2d 532, 536 (Tex.App.—Houston [1st Dist.] 1991, no pet.); *Barnes, supra.* Also, the occupation of a venireperson is a legitimate race-neutral reason for striking a perspective juror. *Tompkins*, 774 S.W.2d at 205; *Barnes, supra.* While four jurors were seated on the jury who omitted certain entries on their juror information cards, their cards did not show the same pattern of characteristics that prompted the prosecutor to strike juror #30.

**(4) Was there disparate examination of a juror, i.e., questioning a juror to evoke a particular response without asking the**

same questions of other panel members? Godine does not complain of disparate examination. Rather, he would have preferred more questioning of all jurors to explain omissions or inconsistencies in the juror information cards.

**(5) Was the State's explanation based on a group bias where the group trait is not shown to apply to the struck juror specifically.** There was no evidence in the record that juror # 30 was struck on the basis of a group trait.

We also note that, although the record does not show the overall racial makeup of the venire panel or the races of all of the individual jurors, there was testimony that three black jurors did sit on the jury.

In sum, after reviewing the record in light of the *Whitsey* factors, we are not of a definite and firm conviction that a mistake was made. The trial court did not err in finding that Godine failed to carry his burden of persuasion to show that the State struck juror # 30 on the basis of her race. We overrule point two.

Having overruled Godine's points of error, we affirm the judgment below.