**Affirmed and Opinion filed June 19, 2012.**



In The

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

———————————

## NO. 14-11-00342-CR

———————————

**JAIME ARTURO ZAMORA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 185th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1225557**

## O P I N I O N

Jaime Arturo Zamora appeals his conviction for capital murder, arguing that the trial court erred in failing to give an accomplice witness instruction for a key prosecution witness; submitting a confusing instruction for three other accomplice witnesses; refusing to allow him to question potential jurors about their possible biases against Hispanics; and failing to give a contemporaneous limiting instruction when it admitted a witness's prior inconsistent statements for impeachment purposes. We affirm.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant and his brother, Danny Zamora, ran a drug distribution network sourcing cocaine and marijuana from Monterrey, Mexico for resale in Houston, Texas. Santiago Salinas, at first a customer of the Zamoras, began to source his own product from Monterrey and compete with the Zamoras for Houston sales in 2005. Benjamin Rosales was a Houston-area paint and body shop owner who maintained a side business reselling drugs out of his shop, first using Salinas as a supplier and later the Zamoras. At some point in 2005, Appellant told Rosales that Salinas owed Danny Zamora money for "some cocaine that he had lost" and he wanted someone to collect the money for him. According to Rosales, appellant gave "three choices. One, he wanted to have him kidnapped to pay the money; or secondly, just go ahead and kill him." The third choice was to collect the debt peacefully. According to Rosales, appellant's primary goal at this time was to collect the money. Rosales tried to recruit two associates to take the job but they declined.

In the late spring or early summer of 2005, four armed men robbed one of the Zamoras' cocaine storehouses in Houston. The Zamoras suspected Salinas was behind the robbery. After the robbery, appellant's intentions appeared to change. He "[w]anted to collect the money that was owed and then afterwards, later on, give it some time, and then turn around and kill [Salinas] anyway." Appellant also told Rosales he had "other people working on it." In May 2006, Danny Zamora orchestrated an attempt on Salinas's life in Monterrey. Salinas was shot in the neck but survived, after which he returned to Houston and went into hiding. Appellant began to put more pressure on Rosales to find Salinas, particularly after Salinas was overheard bragging about having survived the Monterrey assassination attempt. By this time, collecting the money was no longer appellant's primary goal; instead, "they were wanting to go ahead and just kill him." Appellant told Rosales to report to appellant if he saw Salinas and that appellant had "some people already ready to go and get him." Rosales began to drive by certain establishments where he knew Salinas might be, looking for Salinas's car. Rosales called appellant once or twice to tell him he had seen Salinas "but due to the locations . . . [Rosales] wasn't able

2

to find him, didn't know where he was going."[1]

At some point in 2006, Jose Armando Chapa, a customer of the Zamoras, accepted a contract to kill Salinas for one kilo of cocaine or the cash equivalent. On the night of May 20, 2006, appellant called Chapa and said that he wanted to get in touch with Steven Torres, a man whom Chapa had introduced to appellant in January or February of that year. Later that night, Pedro Quintanilla received a call from Torres telling him that he had a job for Quintanilla and an associate of Quintanilla's named Michael Belmarez. Quintanilla and Belmarez were to kidnap Salinas at a seafood restaurant called Chilo's. They did not know Salinas, but Torres described him as wearing an "old school" Houston Astros jersey. Jose Perez was at Chilo's that night with his wife and two young children. He was wearing a Houston Astros jersey meeting that description. As Quintanilla and Belmarez waited in the parking lot outside Chilo's, Torres called them and told them that they should kill Salinas rather than kidnap him. Perez and his family left the restaurant and headed toward their car. Quintanilla got out of the car in which he was waiting, shot Perez three times, and left with Belmarez. Perez died on the scene.

Rosales heard about Perez's murder the next day and was told by an unidentified person that Perez had been a mistaken victim in the hunt for Salinas. Two or three days later, Rosales called Detective E.R. Rogge of the Pasadena Police Department, with whom he had had past contacts, hoping to receive a reward for the information from Crime Stoppers. Detective Rogge told Rosales that the murder had taken place outside of his jurisdiction and Rosales should call the Houston Police Department. Rosales did not make that call. Rosales spoke with appellant, who told him that Perez's murder had been a mistake and that the assassins were "going to be dealt with." Nonetheless, Quintanilla and Belmarez received payment from Torres for their work.

Appellant's efforts to kill Salinas intensified after Danny Zamora was assassinated

---

[1] Rosales also testified that this took place "a few months before" Perez's death.

3

in Monterrey on November 2, 2006. This event eliminated any remaining possibility of merely collecting the debt; appellant's sole aim at this point, according to Rosales, was "to find [Salinas] and he was not worried about the money anymore." On November 20, 2006, appellant and Rosales spotted Salinas at a topless club. Rosales called a customer of his auto shop who had volunteered to kill Salinas and appellant called "somebody else he had" as well. To stall Salinas, Rosales asked three women he knew from the club to keep Salinas busy until the assassins could arrive. The women invited Salinas to join them at the Baymont Hotel, and appellant and Rosales trailed them there. Rosales got the room number from one of the women and communicated it to the hitmen, who arrived and killed Salinas. Appellant paid the assassins at Rosales's shop the next day.

Appellant was charged with the capital murder of Perez. At trial, the jury heard the testimony, summarized above, of Rosales, Belmarez, Chapa, and appellant's brother-in-law Rogelio Gonzalez. No other witnesses connected appellant with Perez's murder. The jury convicted appellant and he was sentenced to life in prison by operation of law.[2]

## II. QUESTIONS PRESENTED

In four issues, appellant argues that the trial court erred in (1) failing to give an accomplice-witness instruction for Rosales; (2) refusing to allow appellant to question potential jurors about their possible bias toward Hispanics; (3) submitting a confusing accomplice-witness instruction for Chapa, Belmarez, and Gonzalez; and (4) failing to give a contemporaneous limiting instruction when the State introduced Chapa's prior inconsistent statements for impeachment purposes.

## III. ANALYSIS

### A. Accomplice Witness as a Matter of Fact

Appellant first argues that the trial court should have given the jury an instruction on

---

[2] *See* TEX. PENAL CODE ANN. §12.31(a) (West 2011).

4

whether Rosales was an accomplice witness as a matter of fact. Before a conviction may rest upon an accomplice witness's testimony, that testimony must be corroborated by other evidence tending to connect the accused with the crime. TEX. CODE CRIM. PROC. ANN. art 38.14 (West 2005); *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). An accomplice is someone who participates with the defendant before, during, or after the commission of a crime and acts with the requisite culpable mental state. *Druery*, 225 S.W.3d at 498 (citing *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004) and *Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986)). To be considered an accomplice witness, the witness's participation with the defendant must have involved some affirmative act that promotes the commission of the offense with which the defendant is charged. *Id.* Complicity with a defendant in the commission of another offense separate from the charged offense does not make that witness an accomplice. *Id.*

A witness may be an accomplice either as a matter of law or as a matter of fact; the evidence in a case determines which jury instruction, if any, needs to be given. *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006). A trial court is obligated to instruct the jury that a witness is an accomplice as a matter of law only if there is no doubt that the witness is an accomplice. *Druery*, 225 S.W.3d at 498. A matter-of-law accomplice instruction is appropriate when the witness is charged with the same offense as the defendant or with a lesser-included offense, or the evidence clearly shows that the witness could have been so charged. *Id.* If the evidence as to a witness's status as an accomplice is conflicting, the jury should determine the witness's status under instructions defining an "accomplice." *Id.* at 498–99; *Blake v. State*, 971 S.W.2d 451, 454–55 (Tex. Crim. App. 1998). However, there must be some evidence of an affirmative act on the part of the witness to assist in the commission of the charged offense before such an instruction is required. *Druery*, 225 S.W.3d at 499. The trial court is not required to give the jury an accomplice witness instruction when the evidence is clear that the witness is an accomplice neither as a matter of law nor as a matter of fact. *Cocke*, 201 S.W.3d at 747 (Tex. Crim. App. 2006).

5

When reviewing claims of jury-charge error, we first determine whether error actually exists in the charge. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If error exists and the appellant objected to the error at trial, we then determine whether the error was sufficiently harmful to warrant reversal. *Id.*; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). In this case, there was no error in the charge because there is no evidence of any affirmative act on Rosales's part to assist in Perez's murder. Appellant cites only Rosales's involvement in the planning and execution of Salinas's murder. For example, he points to (1) Rosales's unsuccessful solicitation of two associates to kill Salinas; (2) Rosales's agreement to look for Salinas's car and to report his seeing it to appellant; and (3) Rosales's actions on the night of Salinas's murder, which took place about six months after Perez's. But complicity with a defendant in the commission of another offense separate from the charged offense does not make one an accomplice witness as to the charged offense. *See Druery*, 225 S.W.3d at 498. At no point did Rosales take any affirmative act to assist in murdering Perez. Rosales testified that he did not look for Salinas at Chilo's on the night of Perez's murder and only called appellant about having seen Salinas several months before Perez's shooting. He did not know Torres, Quintanilla, or Belmarez. Indeed, Rosales testified that he found out about Perez's death by reading about it in the news the next day.[3]

Although Rosales did nothing to directly assist in causing Perez's death, appellant argues that Rosales's actions were "part of the ongoing efforts to collect from, kidnap or kill Santiago Salinas that resulted in the death of Mr. Perez," and therefore that there was sufficient evidence to warrant an instruction about whether he was an accomplice to Perez's murder. Although he provides no citations to legal authorities, we understand appellant to argue that the jury should have been instructed that it could find Rosales an

---

[3] Two or three days after learning of Perez's murder, Rosales contacted Detective Rogge and told him that Perez may have been a mistaken victim of the hunt for Salinas. However, a witness's after-the-fact knowledge of the crime or offer to give information about the crime is not evidence that he was an accomplice. *See Druery*, 225 S.W.3d at 498; *Cocke*, 201 S.W.3d at 747–48.

6

accomplice under the meaning of section 7.02(b) of the Texas Penal Code. *See Paredes*, 129 S.W.3d at 538 (noting that appellant raised this theory but finding it inapplicable under the facts); *Marlo v. State*, 720 S.W.2d 496, 500 n.7 (Tex. Crim. App. 1986) (finding theory "persuasive" but concluding error was not preserved). Section 7.02(b) provides as follows:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE ANN. § 7.02(b) (West 2011). In his requested instruction, however, appellant asked the trial court to include for Rosales the same instruction as that given for Gonzalez and Chapa. That instruction defines an accomplice as

> anyone connected with the crime charged, as a party thereto, and includes all persons who are connected with the crime by unlawful act on their part transpiring either before, at the time of, or after the commission of the offense, and whether or not they were present and participated in the commission of the crime.

It further provides that

> a person is criminally responsible for an offense committed by the conduct of another if . . . he solicits, encourages directs, aids, or attempts to aid the other person to commit the offense.

This definition of vicarious criminal responsibility mirrors that set forth in section 7.02(a)(2) of the Penal Code. *See* TEX. PENAL CODE ANN. § 7.02(a)(2). We conclude that appellant failed to preserve error on this point by requesting an instruction based on section 7.02(b). *See Marlo*, 720 S.W.2d at 500 n.7 (so holding when appellant requested 7.02(a)(2) instruction at trial and raised 7.02(b) issue on appeal). Under the charge requested, the jury could not reasonably have found that Rosales was an accomplice witness, and appellant did not request a charge under which it could have done so.

Appellant separately argues, as he did at trial, that the trial court's refusal to submit

7

an accomplice witness instruction deprived him of his "rights under the Sixth and Fourteenth Amendments to present a complete defense" because his primary defensive theory was that "there [was] nobody except accomplices to connect [him] to the case." To support this proposition, appellant cites *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S. Ct. 1727, 1731, 164 L. Ed. 2d 503 (2006). Although state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials, such exclusions may violate the Constitution if they "infring[e] upon a weighty interest of the accused" and are "arbitrary or disproportionate to the purposes they are designed to serve." *Holmes*, 547 U.S. at 324, 126 S. Ct. at 1731. A rule is arbitrary if it excludes important defensive evidence without serving any legitimate interests. *Holmes*, 547 U.S. at 325, 126 S. Ct. at 1731. This case involves an alleged jury charge error rather than an evidentiary exclusion, but appellant argues that the same principles apply and that the trial court's refusal[4] to submit the issue of Rosales's accomplice status to the jury unconstitutionally infringed upon his right to present a complete defense.

*Holmes* involved a South Carolina rule that the Supreme Court of the United States summarized as follows: "'[W]here there is strong evidence of [a defendant's] guilt, especially where there is strong forensic evidence . . . proffered evidence about a third party's alleged guilt' may (or perhaps must) be excluded." 547 U.S. at 329, 126 S. Ct. at 1734. Because of this rule, Holmes was not allowed to present evidence that a third party had confessed to the crime of which Holmes was accused. 547 U.S. at 323–24, 126 S. Ct. at 1731. The Court held that the rule was arbitrary because "by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt . . ." and concluded that the rule did not serve the legitimate end of "focus[ing] the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." 547 U.S. at 330, 331, 126 S. Ct. at 1734, 1735. The Court distinguished the rule from

---

[4] Appellant does not facially challenge the rule permitting the trial court to make that decision.

8

"well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors" because

> [u]nder this rule, the trial judge does not focus on the probative value or the potential adverse effects of admitting the defense evidence of third-party guilt. Instead, the critical inquiry concerns the strength of the prosecution's case: If the prosecution's case is strong enough, the evidence of third-party guilt is excluded even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of the issues.

547 U.S. at 326, 329, 126 S. Ct. at 1732, 1734.

This case is distinguishable from *Holmes*. In this case, the trial court based its decision solely on the lack of evidence of Rosales's accomplice status under the charge given. This ruling hewed closely to the legitimate end of "focus[ing] the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." *See Holmes*, 547 U.S. at 330, 126 S. Ct. at 1734. Because appellant failed to request an appropriate jury charge on Rosales's accomplice witness status and the trial court did not arbitrarily refuse to submit the charge appellant did request, we overrule appellant's first issue.

## B.    Voir Dire

Next, appellant argues that the trial court erred in refusing to allow him to question potential jurors at voir dire about their possible biases against Hispanics. Appellant's complaint arises from the following exchange at voir dire:

> [APPELLANT]: Now, this lady back here was just talking about he might not be comfortable with the English language. Can everybody tell that he is obviously Hispanic?
>
> VENIREPERSON: Yes.
>
> [APPELLANT]: And the name is Zamora? How many of you believe that because he is Hispanic, with the name of Zamora, I need to prove to you that he is here legally before you can give him a fair trial on these charges?
>
> VENIREPERSON: No.

9

[APPELLANT]: Yes, ma'am?

VENIREPERSON: You mean that's an option? He could be here illegally and not be deported? If he's not here illegally, he wouldn't have already been deported?

THE COURT: Can I see the lawyers at the bench?

(At the bench, on the record.)

THE COURT: Is there some indication that he's not here legally?

[APPELLANT]: I'm just asking if I'm going to have to prove that he's legal.

THE COURT: I'm just wondering if there's some evidence that someone intends to put up.

[APPELLANT]: No.

THE COURT: Then let's move along.

[APPELLANT]: I just want to know if I've got a burden of proof.

THE COURT: Let's move along.

[APPELANT]: I'm not going to be able to explore that, Your Honor?

THE COURT: If it's not going to be an issue in the case, no.

[APPELLANT]: What I'm trying to find out is if the jurors' natural prejudices against Hispanics are such that I have a burden to prove he's here legally before they can give him a fair trial. Am I being not permitted to voir dire on that?

THE COURT: Since that is not an issue in this case and you have interjected something that the jurors have no indication they were going to hear about or would even have an option, as one of the jurors just said, so, no. If it's not an issue, let's not talk about it.

The trial court has broad discretion over the process of selecting a jury. *Sells v.*

10

*State*, 121 S.W.3d 748, 755 (Tex. Crim. App. 2003). Without the trial court's ability to impose reasonable limits, voir dire could go on indefinitely. *Id.* Thus, we leave to the trial court's discretion the propriety of a particular question and will not disturb the trial court's decision absent an abuse of discretion. *Id.* A trial court abuses its discretion when it prohibits a proper question about a proper area of inquiry. *Id. at* 755–56. To preserve error, appellant must show that he was prevented from asking particular questions that were proper. *Id.* at 756; *Godine v. State*, 874 S.W.2d 197 (Tex. App.—Houston [14th Dist.] 1994, no pet.). That the trial court generally disapproved of an area of inquiry from which proper questions could have been formulated is not enough because the trial court might have allowed the proper question had it been submitted for the court's consideration. *Sells*, 121 S.W.3d at 756 (citing TEX. R. APP. P. 33.1(a)(1)(A)).

As the above excerpt shows, appellant complained only about the trial court's general disapproval of an area of inquiry—bias against Hispanics—from which proper questions could have been formulated. He was not prevented from asking particular questions that were proper. After the jury had been selected following voir dire, the trial court asked appellant and the State, "Does either side have any objection to the jury as selected?" Appellant answered, "No, Your Honor."[5] The remainder of the panel was then excused. The next day, appellant submitted a document entitled "Withdrawal of 'No Objection' Statement in Regards to Jury and Specific Voir Dire Questions the Defense Was Precluded by the Court from Posing to the Panel." In this document, appellant listed a number of specific questions he wished to ask the panel. By this time, however, the jury had already been selected and the time for questioning potential jurors had passed. We hold that appellant failed to preserve error on this point by timely submitting specific questions that he wished to ask the venire members. *See Dhillon v. State*, 138 S.W.3d 583, 590 (Tex. App.—Houston [14th Dist.] 2004, pet. struck) (waiting until after voir dire

---

[5] *See Harrison v. State*, 333 S.W.3d 810, 812–13 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (appellant waives any error relating to the voir dire process when he affirmatively states that he has no objections to the jury as seated) (citing *Dixon v. State*, No. 14-05-001310-CR, 2006 WL 2548175, at *6 (Tex. App.—Houston [14th Dist.] Sept. 5, 2006, no pet.) (not designated for publication) (same)).

is completed to complain about unasked questions fails to preserve error); *S.D.G. v. State*, 936 S.W.2d 371, 380–81 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (appellant failed to preserve error when he did not present specific questions he would have asked until six days after panel was selected and testimony commenced). Accordingly, we overrule appellant's second issue on appeal.

## C.     Confusing Accomplice-Witness Instructions

Appellant next argues that the trial court's accomplice-witness instructions for Gonzalez, Chapa, and Belmarez were unconstitutionally contradictory and confusing because—while they instructed the jury that accomplice-witness testimony had to be corroborated by non-accomplice witness testimony—they also contained clauses erroneously implying that the jury could convict appellant solely on the basis of "stacked" accomplice-witness testimony. When reviewing charge errors, we undertake a two step review: first, we must determine whether error actually exists in the charge; and second, we must determine whether sufficient harm resulted from the error to require reversal. *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)). We conclude that the jury charge in this case contains no error, and further conclude that sufficient harm did not result from any harm to require reversal.

The jury charge contained the following accomplice-witness instruction pertaining to Gonzalez, Belmarez, and Chapa:

> You are instructed that a conviction cannot be had upon the testimony of an accomplice unless the accomplice's testimony is corroborated by other non-accomplice testimony evidence tending to connect the defendant with the offense charged . . . .

However, appellant complains that each accomplice-witness instruction also contained a clause implying that other accomplice-witness testimony could be used to corroborate that witness's accomplice-witness testimony. Belmarez's accomplice-witness instruction, for example, read as follows:

> The witness, Michael Belmarez, is an accomplice, if an offense was committed, and you cannot convict the defendant upon his testimony unless you further believe that there is other evidence in the case, outside of the testimony of Michael Belmarez tending to connect the defendant with the offense committed . . . .

A similar instruction was given for Gonzalez and Chapa, adjusted to reflect their being accomplices as a matter of fact. Appellant therefore argues the charge as a whole was unconstitutionally contradictory and confusing.

Appellant cites two cases for the general proposition that contradictory jury instructions may be problematic: *Penry v. Johnson*, 532 U.S. 782, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001), and *Watson v. State*, 146 Tex. Crim. 425, 175 S.W.2d 423 (1943). Both of those cases, however, involved contradictions that a reasonable juror could not reconcile. There is no real contradiction in the instructions before us; only if the jury unnecessarily and unreasonably interpreted the second clause as contradicting the unambiguous directive of the first clause could it have become "confused" about the meaning of the instructions. As the Court explained in *Penry*, the instruction considered there "placed law-abiding jurors in an impossible situation" because "answering the special issues in the mode prescribed by the supplemental instruction [which allowed the jury to consider mitigating evidence to mitigate punishment even if it answered "yes" to all three special issues] necessarily meant ignoring the verdict form instructions [which required the jury to answer "yes" or "no" to three special issues solely based on the evidence and gave no other avenue to mitigate punishment]." *Penry*, 532 U.S. at 799–800, 121 S. Ct. at 1921–22. Here, the jury was given only one unambiguous instruction about corroboration: that it had to be in the form of non-accomplice witness testimony. The jury could only have been "confused" by the charge if it disregarded that clear instruction on corroborative evidence in favor of an unnecessarily contradictory interpretation of the second clause.

Similarly, the charge in *Watson* involved what the court saw as an inescapable

13

logical contradiction between two unambiguous paragraphs of the charge—one telling the jury that it could consider a prior conviction as evidence of motive, the other telling the jury that it could not consider the prior conviction as evidence of guilt. Because "[m]otive for the commission of a crime is . . . a part of the crime itself, and, of necessity, tends to establish the guilt of the accused," it was impossible to give effect to both parts of the charge. *Watson*, 146 Tex. Crim. at 429, 175 S.W.2d at 425. Here, the language of the charge would only give rise to a logical contradiction if the jury unnecessarily interpreted it to do so.

Further, even if error existed in the charge, sufficient harm does not result from any error to require reversal. Gonzalez's and Chapa's respective statuses were not submitted as special issues. The jury may have concluded that Gonzalez or Chapa was not an accomplice witness. It is also possible that the jury believed that Rosales's testimony, which under the charge given was non-accomplice testimony, corroborated the accomplice testimony. Because the jury charge was not unconstitutionally contradictory or confusing and sufficient harm did not result from any alleged error, we overrule appellant's third issue.

## D. Limiting Instruction

Finally, appellant argues that the trial court erred in refusing to give a contemporaneous limiting instruction when it admitted Exhibit 111, Chapa's prior inconsistent statements, in full, for impeachment purposes and that the instruction in the jury charge was inadequate. The tape was played in two different manners during the trial: during the State's case in chief, only excerpts were played; during appellant's case in chief, the tape was played in full.

## 1. The first playing of the tape

During its case in chief, the State called Chapa to testify that he had introduced appellant to Torres in January or February of 2006; that appellant called Chapa one night several months later looking for Torres because there was "a person at Chilo's [Torres] needed to talk to;" that appellant told Chapa that the person was wearing a jersey; and that

14

Chapa called Torres to tell him that appellant was trying to reach him. On the stand, Chapa denied that any of these things happened. The State offered into evidence a tape-recorded interview in which Chapa told the police the opposite of his trial testimony. Appellant objected that parts of the tape were inadmissible hearsay. The trial court told the parties that it would not admit Exhibit 111 in full, but would admit excerpts of it for impeachment purposes as the need arose. As the State played several excerpts to impeach specific parts of Chapa's testimony, appellant repeatedly objected to the "hunt and peck method," which, he argued, inadvertently allowed the jury to hear parts of the interview that were not admissible for impeachment. The trial court sustained several of appellant's objections to the inadmissible portions of the tape, telling the parties that it would instruct the jury to disregard the inadmissible portions.[6] No such instruction appears in the record. At this time, appellant never requested a limiting instruction that the tape was for impeachment only.

It is difficult to determine exactly what part of the tape was played at this point because the court reporter did not record what the tape said. Instead the reporter noted only that a portion of State's Exhibit 111 was played.[7] The clearest example of what was

---

[6] [APPELLANT]: Your Honor, may we approach?

THE COURT: Okay.

(At the bench, on the record.)

[APPELLANT]: This isn't working. The jury has heard now three different things that the jury wasn't supposed to hear out of three of her hunts and pecks. She started with the question the officer made inadvertently. It's not her fault. She's just doing it by a flawed method and this is—we object to the method.

THE COURT: Your objection's sustained.

[THE STATE]: May I—may we—may I respond?

THE COURT: Well, your objection to that—I'll instruct the jury to disregard that part of the tape.

[7] Although this complies with section 3.20 of the Uniform Format Manual for Texas Reporters'

15

actually played is as follows:

> (A portion of State's Exhibit 111, the audio statement of Jose Chapa, was played.)
>
> Q. Did you hear that?
>
> A. Yes, ma'am.
>
> Q. That's your voice, isn't it?
>
> A. Yes, ma'am.
>
> Q. Did you hear "Chilo's"?
>
> A. Yes, ma'am.
>
> Q. Did you hear "jersey"?
>
> A. Yes, ma'am.
>
> Q. So, you told the officer that Steve called—that [appellant] called you wanting to know if you would put them together, that there was a person at Chilo's wearing a jersey?   Right?
>
> A. Right.

## 2.    The second playing of the tape and its admission in full

The next day, appellant recalled Chapa in his own case in chief.   Chapa again denied the substance of his earlier statements to the police.   On cross-examination, the State asked the trial court to admit Exhibit 111 in full:

---

Records, it creates an unclear record.  In September 2008, the Supreme Court Advisory Committee recommended to the Supreme Court that this rule be changed to require the reporters to make a contemporaneous verbatim record of what was played.  *See Meeting of the Supreme Court Advisory Committee (Friday Session)*, p. 17239 (Sept. 5, 2008), *available at* http://www.supreme.courts.state.tx.us/rules/scac/2008/090508a-trans.pdf.  However, the Supreme Court instead opted for section 3.20, which states: "When the audio or audio-visual recordings are played in court, a contemporaneous verbatim record of the proceedings will not be made unless the court so orders." *Uniform Format Manual for Texas Reporters' Records*, § 3.20, *available at* http://www.crcb.state.tx.us/pdf/Uniform%20Format%20Manual-07012010.pdf.  Thus, lawyers must be sure to ask the court to order the reporter to make such a record—otherwise, as here, the record is unclear.

[THE STATE]: Judge, certainly the best evidence now would be the admission in totality of State's Exhibit No. 111, which has been proven by the officer with the seal, to say that this is a fair and accurate recording of the conversation between him and this witness. And because of the circumstances of this witness'[s] testimony, I ask that this tape be admitted and published to the jury in its entirety.

THE COURT: Counsel?

[APPELLANT]: Your Honor, counsel well knows that it's not admissible and we object to anything in this whole proceeding that goes outside of the rules of evidence. He has acknowledged that he said that in the interview.

[THE STATE]: What he has said is he was badgered and the police officers were saying Jaime, Jaime, Jaime, Jaime, Jaime; and so, he had no choice but to just—

THE COURT: Okay. All right. State's Exhibit 111 is admitted.

[THE STATE]: And I ask that it be published right now.

THE COURT: Okay.

[APPELLANT]: Your Honor, we ask for a limiting instruction on the playing of the tape, that it's been—that it's being played for purposes of impeachment and for nothing other.

THE COURT: I'm not going to give you a limiting instruction at this point.

In his requested jury charge, appellant asked the trial court to instruct the jury to consider Exhibit 111 "only for the purpose of impeaching the testimony of Jose Armando Chapa . . . [and] not consider the audio recordings or any part thereof, as evidence of the truth of the matters asserted in such recordings." The trial court instructed the jury to consider Exhibit 111 "only for the purpose of impeaching the testimony of Jose Armando Chapa" but did not include the remaining language.

Appellant contends that the trial court erred in denying his request for a contemporaneous limiting instruction. Appellant further argues that the limiting

17

instruction in the jury charge was inadequate to cure this error because (1) "[a]n instruction given for the first time during the jury charge necessarily leaves a window of time in which the jury can contemplate the evidence in an inappropriate manner;" and (2) although the jury was instructed to consider Exhibit 111 "only for the purpose of impeaching the testimony of Jose Armando Chapa," the trial court denied his requested instruction to "not consider the audio recordings or any part thereof, as evidence of the truth of the matters asserted in such recordings." Finally, appellant argues that he was harmed by the trial court's failure to give a limiting instruction at the time he requested it because the State, in its closing argument, referred to Chapa's statements and demeanor in the recording as evidence of appellant's guilt.

Limiting instructions are most effective when they are simultaneously provided with the related evidence. *Rankin v. State*, 974 S.W.2d 707, 712 (Tex. Crim. App. 1996). Thus, when evidence is admitted for a limited purpose, the trial court must, upon request, provide a midtrial limiting instruction. *Id.* This is so because failing to provide the instruction may improperly result in the jury forming a negative inference about the defendant. *Jackson v. State*, 992 S.W.2d 469, 477 (Tex. Crim. App. 1999). And this improper inference, once formed, cannot easily be cured by an instruction in the jury charge. *Id.* If the jury is required to consider evidence in a limited manner, then it must do so from the moment the evidence is admitted. *Hammock v. State*, 46 S.W.3d 889, 894 (Tex. Crim. App. 2001). Allowing the jury to consider evidence for all purposes and then telling them to consider that same evidence for a limited purpose only is asking a jury to do the impossible. *Id.* If a limiting instruction is to be given, it must be when the evidence is admitted to be effective. *Id.* (citing *Rankin*, 974 S.W.2d at 713).

However, it remains the defendant's responsibility to request a limiting instruction at the first opportunity to do so. *Hammock*, 46 S.W.3d at 895 (declining to overrule *Garcia v. State*, 887 S.W.2d 862, 878 (Tex. Crim. App. 1994)). Once evidence is admitted without a proper limiting instruction, it becomes part of the general evidence in

the case and may be considered for all purposes. *Arana v. State*, 1 S.W.3d 824, 829 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd). In the first playing of the tape, during the State's case in chief, the trial court allowed portions of Chapa's interview to be played. Appellant objected at that time but did not request a limiting instruction. He therefore failed to preserve error on the trial court's failure to give a limiting instruction as to those portions of the tape. *See Rodriguez v. State*, 968 S.W.2d 554, 560 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (appellant failed to preserve error when he objected on hearsay grounds but did not request limiting instruction at time impeaching statement was introduced). Those portions of the tape then became general evidence for the jury to consider. *See Arana*, 1 S.W.3d at 829.

Appellant argues that he was "entitled to a limiting instruction at the point that the remainder of the recording was made available to the jury—the portions of the recording to which a limiting instruction was relevant." We agree that appellant was entitled to a limiting instruction at that time. *See Rankin*, 974 S.W.2d at 712. However, on the record before this court, we conclude that appellant was not harmed by the trial court's admission of the full tape. We cannot determine from the record what portions of the tape were originally played without a limiting instruction and what portions were played later. Although we have the full audio tape in the record, we do not know precisely which parts were played to the jury without a limiting instruction. In addition, we can infer from the record that the portions of the tape that were most damaging to the appellant—that he tried to call Torres to tell Torres about a person at Chilo's wearing a jersey (which was the location and apparel of Perez)—were played during the State's case in chief without a limiting instruction, and therefore became general evidence. Appellant points to the State's closing argument to show harm, but because of the lack of a complete record, we cannot determine whether the damaging statements to which the State referred in closing had already been played to the jury without a limiting instruction. To the extent the record does shed light on this question, as noted above, it tends to show that the jury had already heard those portions referenced by the State without a limiting instruction. In the absence

19

of a complete record, we must presume that the record at trial supported the trial court's decision to overrule appellant's objection to the State's argument, and thus that the argument did not contain references to matters not in evidence. *See Perez v. State*, 261 S.W.3d 760, 772 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) ("Without a reporter's record, we have no way of knowing whether any of the evidence appellant complains of was actually admitted at trial. This, in turn, precludes us from assessing the potential harm caused by the trial court's alleged errors."); *Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011) (a prosecutor may not use closing arguments to present evidence that is outside the record).

Appellant was also not entitled to the second part of his limiting instruction—to "not consider the audio recordings or any part thereof, as evidence of the truth of the matters asserted in such recordings." As discussed above, portions of the tape had already come into evidence as general evidence; the jury was therefore entitled to consider those portions as evidence of the truth of the matters asserted therein. *See Arana*, 1 S.W.3d at 829.

We find no harm in the admission of the entire tape without the contemporaneous limiting instruction or in the denial of the requested jury instruction. We overrule appellant's final issue.

## IV. CONCLUSION

Having overruled all of appellant's arguments, we affirm.


/s/　　Tracy Christopher
　　　　Justice

Panel consists of Justice Frost and Justices Brown and Christopher.

Publish — TEX. R. APP. P. 47.2(b).

20