Jack Gilbert HELD, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–94–01146–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

June 12, 1997.

Frank Blazek, Huntsville, for appellant.

Calvin Hartman, Houston, for appellee.

Before MURPHY C.J., and ANDERSON and O'NEILL, JJ.

## OPINION

ANDERSON, Justice.

Jack Gilbert Held appeals his conviction for driving while intoxicated. Raising six points of error, he argues that the trial court erred by (1) overruling his *Batson* challenge, (2) admitting an officer's testimony on the administration of horizontal gaze nystagmus testing when he was not qualified as an expert, (3) admitting the results of an intoxilyzer test, (4) permitting expert testimony on the level of alcohol concentration at which an individual loses his normal physical and mental capabilities, (5) permitting the expert to respond to hypothetical questions based on facts not in evidence, and (6) permitting the expert to render an opinion that appellant was intoxicated without an adequate basis for this opinion. We find all of appellant's points of error without merit and affirm the judgment of the court below.

At approximately 1:30 a.m. on the date of the offense, Officer M.J. Ledet, a detective with the Metro police department, was patrolling north Houston when he observed appellant's vehicle weaving randomly in and out of three lanes of traffic. Ledet stopped the vehicle. When appellant rolled down his window, Ledet smelled alcohol, noticed appellant's eyes were red and glossy, that his speech was slurred, and that appellant appeared to be supporting himself by holding onto the side of his car. Ledet administered field sobriety tests and concluded that appellant was intoxicated. He arrested appellant and transported him to the city jail, where appellant submitted to two intoxilyzer tests. The first test revealed a blood alcohol concentration of .133 percent, and the second test showed a concentration of .118 percent. Finally, appellant was videotaped performing a number of field sobriety tests. Based on this and other evidence introduced at trial, a jury convicted appellant of driving while intoxicated.

In his first point of error, appellant argues that the trial court erred when it overruled his *Batson* challenge to veniremember number twelve, an African American woman, without first obtaining a race neutral reason from the State to justify the use of its peremptory strike against her. Only two African American veniremembers were within the strike range on the misdemeanor panel from which appellant's jury was selected. One of them was successfully challenged for cause, and appellant stipulated that there

was no racial motivation for this particular challenge. The remaining African American was stricken by the State, leaving no members of that particular race on the jury. Appellant, who is not African American, raised a timely objection to the State's strike and requested a *Batson* hearing. As his prima facie case, appellant alleged merely that the State had stricken veniremember number twelve, an African American, stating "That's all we have, a one hundred percent exclusion of African Americans." The court's response was, "Proceed with your proof." However, appellant chose to rely solely upon the fact that this single strike was exercised to establish his prima facie case. The State responded by arguing that this evidence was insufficient to meet the appellant's burden. The trial judge agreed, denying appellant's challenge on the ground that "there was no evidence before this Court that there was a racially oriented peremptory challenge."

Under *Batson,* a party who challenges the opposing party's exercise of peremptory strikes on racial[1] grounds must make out a prima facie case of purposeful discrimination. *Batson v. Kentucky,* 476 U.S. 79, 97, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986). The burden then shifts to the other party to give neutral reasons for the strike. *Id.* At this point, the challenging party must persuade the trial court that the strikes were exercised in a purposefully discriminatory manner. *Id.* These later steps are never reached, however, if the trial court first rules that the challenging party has failed to meet his initial burden of making out a prima facie case of discrimination.[2] *Bean v. State,* 816 S.W.2d 115, 117 (Tex.App.—Houston [14th Dist.] 1991, no pet.).

In the *Batson* context, a prima facie case is "that minimum quantity of evidence necessary to support a rational inference that the allegation of purposeful discrimination is true." *Harris v. State,* 827 S.W.2d 949, 955 n. 4 (Tex.Crim.App.1992). The challenging party is entitled to rely on the fact that peremptory challenges permit discrimination by those who are of a mind to discriminate and must show that this fact, coupled with any other relevant circumstances, raises an inference of the discriminatory exercise of peremptory strikes. *Id.* at 955; *Godine v. State,* 874 S.W.2d 197, 203 (Tex.App.—Houston [14th Dist.] 1994, no pet.). As the party with the burden of proof, appellant was required to produce this evidence to avoid a finding that the allegation of purposeful discrimination was not true as a matter of law. *Dewberry v. State,* 776 S.W.2d 589, 590 (Tex. Crim.App.1989).

In deciding whether the requisite showing of a prima facie case has been made, all relevant circumstances should be considered. *Harris,* 827 S.W.2d at 955. Judges at all levels must "frankly assess" the legitimate inferences to be drawn from the evidence made available to them. *Linscomb v. State,* 829 S.W.2d 164, 166 (Tex.Crim.App.1992). The trial judge, however, is in the best position to note whether the circumstances as he has viewed them are sufficient to raise a prima facie case that a single strike against a given veniremember was racially motivated. *See Muhammad v. State,* 846 S.W.2d 432, 435 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd). That court has an opportunity to observe the makeup of the panel, the questions asked each veniremember, the unspoken reactions of the attorneys and the potential jurors, the manner in which the other strikes were exercised, and countless other factors. As the Supreme Court noted in *Batson,* "[w]e have confidence that trial judges, experienced in supervising *voir dire,* will be able to decide if the circumstances ... [create] a prima facie case of discrimination...." *Batson,* 476 U.S. at 97, 106 S.Ct.

1. We recognize that *Batson* is no longer limited to racial discrimination in the exercise of peremptory challenges. *See, e.g., J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). However, because the allegation in this case involves racial exclusion, our references to the applicable standards generally refer to this type of strike.

2. In fact, if neutral reasons are provided and the trial court rules on the ultimate issue of intentional discrimination, the issue of whether the challenger has established a prima facie case becomes moot. *Malone v. State,* 919 S.W.2d 410, 412 (Tex.Crim.App.1996). In this case, however, the State did not offer any reasons for the strike due to the court's ruling that the burden of doing so never shifted after appellant failed to make out a prima facie case.

at 1723. Thus, we will give deference to the trial court's judgment on this matter and review the record of the *Batson* hearing and voir dire examination in a light most favorable to the trial court's ruling. *See Adanandus v. State,* 866 S.W.2d 210, 224 (Tex.Crim. App.1993); *Williams v. State,* 804 S.W.2d 95, 101 (Tex.Crim.App.1991). We will not disturb that ruling unless we find it to be clearly erroneous. *Id.*

With these guidelines in mind, we have examined the record in order to frankly assess whether appellant has raised sufficient facts and circumstances to support a rational inference of purposeful discrimination in the State's exercise of its peremptory challenges. What we find is appellant's bare allegation that he met his burden by merely pointing out that the State struck one hundred percent[3] of the African American veniremembers on the panel. While this statistic, on its face, might appear compelling, the actual facts before the trial court when it ruled on appellant's prima facie case were far less so. Here, the judge witnessed the State's exercise of one of its three peremptory strikes against an African American in a case where the defendant was white and race was completely unrelated to the issues in the case. The fact that the State exercised its strike in such a manner that it effectively eliminated all the members of a particular race from the jury panel is far less significant when the number stricken constitutes a grand total of one.

We find very little guidance for determining whether striking a single member of an ethnic group is enough, standing alone, to make out a prima facie case. Generally, however, courts have been reluctant to allow the analysis to deteriorate into a purely statistical one. *See United States v. Dawn,* 897 F.2d 1444, 1448 (8th Cir.), *cert. denied,* 498 U.S. 960, 111 S.Ct. 389, 112 L.Ed.2d 400 (1990) (holding that "numbers alone are not sufficient to establish or negate a prima facie case.") Rather, "determining whether a pri-

ma facie case has been established requires consideration of all relevant circumstances, including whether there has been a pattern of strikes against members of a particular race." *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 631, 111 S.Ct. 2077, 2088, 114 L.Ed.2d 660 (1991). A single strike does not constitute a pattern.

Nevertheless, the cases are replete with the statement that if *even one* veniremember is stricken from a panel *because of his race,* the equal protection clause is violated and the results cannot stand. *See, e.g., Emerson v. State,* 851 S.W.2d 269, 274 (Tex. Crim.App.1993); *Linscomb,* 829 S.W.2d at 166. Although we cannot say that a single strike against a member of a given race is *never* enough to make out a prima facie case of racial discrimination, we are equally reluctant to hold that it is *always* enough. "The bare fact of strikes exercised against persons of a certain race does not necessarily reveal the work of a racially prejudiced mind." *Linscomb,* 829 S.W.2d at 166. Thus, while statistical evidence alone may be conclusive in cases where strikes are exercised against a given race disproportionately or in suspiciously large numbers, in cases where the numbers are not so compelling, the trial court may rightly find that the statistics alone do not make out a prima facie case. *Muhammad,* 846 S.W.2d at 435 (analyzing *Linscomb,* 829 S.W.2d at 166); *see also Aguilar v. State,* 826 S.W.2d 760, 763 (Tex.App.—Fort Worth 1992, pet. ref'd) (holding that the strike of one Hispanic veniremember was insufficient to make out a prima facie case of discrimination where the challenging party "failed to show any pattern or any other evidence to the trial court which would raise an inference that the prosecutor used peremptory strikes to remove [that veniremember] on account of her race."). In sum, the proper analysis does not consist of merely looking for some magic number or "telling" percentage of stricken veniremembers of a particular race, but rather involves de-

---

3. We believe appellant overstates his case when he contends that the State exercised its peremptory challenges in such a way that he struck *one hundred percent* of the African American veniremembers. Appellant conceded that there was another African American within strike range on the panel, and stipulated that this individual was successfully *challenged for cause* on grounds that were completely unrelated to his race. Therefore, the record demonstrates that the State used peremptory strikes to eliminate fifty percent of the African American veniremembers.

termining whether a sufficient combination of factors, which may include statistics, exists to raise an inference that those who were stricken *were stricken on account of their race*. *Aguilar*, 826 S.W.2d at 763.

■ In this case, appellant's prima facie case is based entirely on statistics. Because a single strike of an African American does not alone constitute a suspiciously large or disproportionate number, the statistical evidence urged by appellant is not sufficiently weighty that it can support an inference of discrimination per se. Although we have uncovered cases in which a prima facie case was made out based on the assertion that a given race was excluded from the jury as a result of the exercise of a single strike, in those cases more than one factor operated to support the inference that the single strike was racially motivated. *See, e.g., Salazar v. State*, 818 S.W.2d 405, 407 (Tex.Crim.App. 1991); *Godine*, 874 S.W.2d at 203. That additional factor was that the defendant was of the same race as the stricken veniremember. *Salazar*, 818 S.W.2d at 407; *Godine*, 874 S.W.2d at 203.

■ While an individual is no longer required to show he is a member of a cognizable racial group before he has standing to raise a *Batson* challenge, where racial identity between the party asserting *Batson* and the stricken veniremember exists, "it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred." *Powers v. Ohio*, 499 U.S. 400, 416, 111 S.Ct. 1364, 1373–74, 113 L.Ed.2d 411 (1991). Logically, in cases where the challenging party is a member of a cognizable racial group or where race is an issue in the case, a discriminatory purpose in the exercise of strikes against veniremembers of that same race is more readily apparent. *See id.* Therefore, although racial identity between the challenger and the excused veniremember is not required to raise a *Batson* challenge, the absence of such an identity can certainly impact the strength of the challenger's prima facie case of racial discrimination. *See id.; see also Bean*, 816 S.W.2d at 119 (holding that where defendant was not African American and established only that the State exercised four out of ten peremptories to strike African American veniremembers a prima facie case of racial discrimination had not been made). This impact is especially significant in cases like this one where the statistical evidence is weak.

We recognize that the burden of raising a prima facie case at a *Batson* hearing is not intended to be an onerous one. *Bean*, 816 S.W.2d at 120. Nevertheless, this court has been reluctant to permit the requirement to become so effortless "as to effectively eliminate what little is left of the *Batson* prima facie case test." *Id.* While establishing a prima facie case has traditionally been a low hurdle, the difficulties and delays that can result from constant *Batson* battles in which an officer of the court's motives are taken to task without an adequate basis, compel our conclusion that the prima facie hurdle should not be so low as to constitute no hurdle at all. "*Batson* is not a talisman, the invocation of which automatically raises an inference of racial discrimination." *Id.* at 119. The challenger has the duty to provide us with a sufficient record to support that inference. *See Dutton v. State*, 836 S.W.2d 221, 225 (Tex.App.—Houston [14th Dist.] 1992, no pet.). That evidence does not necessarily have to include racial identity between the challenger and the stricken veniremember, but we must have *some* supporting evidence to raise an inference of discrimination, beyond the exercise of a single strike, before we will reverse a trial court's determination that a prima facie case has not been established.

In the present case, a Caucasian defendant challenged the use of a single peremptory strike against a veniremember of a different race in a trial for an offense in which race was not an issue, and there was no discernible pattern otherwise evidencing discrimination in the State's exercise of its strikes. Appellant relies on nothing more than the bare assertion that striking the sole remaining African American veniremember is enough to support an inference that the State had a discriminatory motive. This evidence was not enough for the trial court, and we defer to that court's sound judgment.

Accordingly, we overrule appellant's first point of error.

In his second point of error, appellant argues that Officer Ledet, who testified on the administration of horizontal gaze nystagmus (HGN) testing, was not qualified as an expert. Whether a witness is qualified to testify as an expert is a matter that rests within the discretion of the trial court. *Sterling v. State*, 800 S.W.2d 513, 521 (Tex.Crim.App. 1990). Absent a clear abuse of discretion, we will not disturb the trial court's ruling on this issue. *Id.*

■ In order for a police officer or law enforcement official to testify as an expert on the administration of the HGN test, he must merely prove that he is certified to "administer" the HGN test by the State of Texas. *Emerson v. State*, 880 S.W.2d 759, 769 (Tex. Crim.App.1994). Officer Ledet's uncontradicted testimony indicates that he received state certification to "perform" the HGN test.

■ Appellant makes much of the fact that the officer testified he was certified to *perform* the test rather than to *administer* the test, contending that these two criteria are "substantially different." We fail to recognize the distinction that seems so readily apparent to appellant. Indeed, we find it to be a distinction without any underlying difference. In addition, appellant complains that the officer's testimony did not describe his specific qualifications or the training he received to obtain certification. However, this additional information is not necessary to satisfy the predicate for expert testimony on HGN testing. Thus, we find that Officer Ledet was qualified as an expert to testify concerning the HGN test, and the trial court did not abuse its discretion in permitting his testimony.

In his third point of error, appellant argues that the trial court erred when it permitted the results of the two intoxilyzer tests to be admitted into evidence because (1) these results were the fruit of an illegal stop and arrest, and (2) appellant was not given proper warnings before the test was administered.

Regarding the legality of the stop, appellant argues that Officer Ledet did not have probable cause to pull him over for failing to maintain a single lane of traffic. He contends that because the officer failed to indicate that he crossed over into other lanes of traffic in an unsafe manner, the officer lacked probable cause to believe that an offense had been committed. We need not address whether the officer had probable cause to stop appellant on these facts, however, because probable cause is not needed to stop a vehicle for investigatory purposes.

■ In order to temporarily detain an individual for investigation, an officer need only articulate specific facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminally related activity. *Townsend v. State*, 813 S.W.2d 181, 185 (Tex.App.—Houston [14th Dist.] 1991, pet. ref'd). An officer's observation of a driver weaving back and forth across several lanes of traffic is sufficient to give rise to a *reasonable suspicion* that the driver *may* be intoxicated. *Id.* It is irrelevant that the actual weaving may or may not be criminal in and of itself.

■ Once Officer Ledet stopped appellant, he developed probable cause to subsequently arrest him when he noticed that appellant smelled of alcohol, slurred his speech, had glossy, bloodshot eyes, and leaned on his car for support, in addition to the fact that he failed the field sobriety tests administered by the officer. Because appellant's stop and arrest were lawful, the results of the intoxilyzer tests that eventuated from them were properly admitted into evidence at appellant's trial.

■ As his second ground in support of his third point of error, appellant argues that because Officer Ledet was a peace officer employed by Metro Police Department, a division of the Metropolitan Transit Authority, he did not have the authority to arrest appellant. As a result, appellant asserts that the intoxilyzer test results should not have been admitted because they were the fruit of an unlawful arrest. We disagree. Metro police officers have jurisdiction to enforce the traffic laws in every county where Metro

provides services. *See State v. Norton,* 899 S.W.2d 303, 304–05 (Tex.App.—Houston [14th Dist.] 1995, no pet.); *State v. Elliott,* 879 S.W.2d 381, 384 (Tex.App.—Waco 1994, pet. ref'd). Article 1118x § 13(c) of the Texas Revised Civil Statutes states that Metro peace officers may, among other things, enforce all traffic laws within "the system." Section 2(f) defines "the system" for an authority with a principal city with a population of more than 1.5 million, like Houston, as "the area within the boundaries *wherein service is provided* or is supported by a general sales and use tax." (emphasis added). According to his testimony, Officer Ledet pulled appellant over on a freeway in Harris County. In addition, Ledet testified that Metro provides services in Harris County and four other counties. Based on this unrefuted testimony, we hold that the officer had geographical jurisdiction to enforce the traffic laws in Harris County, where appellant was stopped and subsequently arrested.

As his final ground in support of his third point of error, appellant contends the results of the intoxilyzer test should not have been admitted into evidence because appellant did not voluntarily consent to the test. A suspect's decision to submit to a breath test must be made freely and with a correct understanding of the actual statutory consequences of refusal. *Erdman v. State,* 861 S.W.2d 890, 893 (Tex.Crim.App.1993). Thus, the suspect must be informed that if he refuses to submit to the breath test, his refusal may be admissible in a subsequent prosecution and his license, permit, or privilege to operate a motor vehicle will be automatically suspended for 90 days. TEX.REV. CIV. STAT. art. 6701*l*–5, § 2.[4]

■ At trial, the arresting officer testified that he administered the "police officer's DWI Statutory Warning." Nevertheless, appellant contends that the warning given was incomplete in that it failed to advise appellant "that he had a right to have a hearing and that if he failed to take the breath test, that before his license could be suspended, that there would have to be a determination

on probable cause to believe that he had committed a DWI, and probable cause to believe that he was operating a vehicle on a public roadway." According to the officer's express testimony, however, appellant was indeed informed that he had a right to a hearing. We hold that the additional information concerning the requirement that a probable cause determination be made at the hearing is simply not required. *See Erdman,* 861 S.W.2d at 893 (holding that *only* the two statutorily required warnings should be given). "An officer advising an accused of his statutory rights does not undertake the role of counsel to advise the accused of all the ramifications of such rights." *Vester v. State,* 916 S.W.2d 708 (Tex.App.—Texarkana 1996, no pet.). Thus, we find no error lies in the officer's failure to inform appellant of the criteria used to determine if his license should be suspended at the hearing. A trial court's decision to admit certain evidence will not be overturned absent a showing that the court abused its discretion. *Erdman,* 861 S.W.2d at 893. Having found that the initial traffic stop of appellant was lawful, that the arresting officer had the authority to arrest appellant, and that the appellant's consent to the intoxilyzer test was voluntary, we hold that the trial court did not abuse its discretion in admitting the results of the intoxilyzer test. Thus, we overrule appellant's third point of error.

In appellant's fourth point of error, he argues that the trial court erred when it permitted Sebastian Frommhold, a chemist for the Houston Police Department, to testify concerning the levels of alcohol concentration at which an individual loses the normal use of his physical and mental capabilities. Texas Rule of Criminal Evidence 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence *or to determine a fact in issue,* a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." A witness's qualification to testify as an expert is a determina-

---

**4.** This statute, effective at the time the facts of this case occurred, has since been repealed and recodified effective September 1, 1995.

tion which rests within the discretion of the trial court. *Sterling,* 800 S.W.2d at 521. Unless we find the trial court abused its discretion, we may not overturn the court's decision. *Id.*

In this case, Frommhold testified that he had spent four and a half years as a chemist for the Houston Police Department and five years as a technical supervisor for the Harris County Breath Testing Program. During this time, he stated that he had observed approximately one hundred individuals who were intoxicated to the point that they had, in his opinion, lost the normal use of their physical and mental capabilities. Frommhold testified that his observations were based on his training at the National Highway Traffic Safety Administration School on standard field sobriety testing, where he participated in numerous controlled drinking exercises in which individuals are given measured doses of alcohol to get them to specific alcohol concentrations. We hold that the trial court did not abuse its discretion when it found that Frommhold was qualified to testify as an expert as to his opinion on when an individual loses the normal use of his physical and mental faculties.

In his fifth point of error, appellant argues that the trial court improperly permitted the State's expert, Frommhold, to extrapolate the blood alcohol level of the appellant at the time of driving based on hypotheticals which assumed facts not in evidence. The first hypothetical that the State addressed to Frommhold was as follows:

> [L]et's assume that a subject was last seen driving at 1:35 in the morning. And that same subject was tested at 2:15 in the morning. And the result of that test—and again I'll use the lowest number—was .118, and assuming that they were eliminating, or I believe you called it metabolization and they were eliminating alcohol from their system during that time. What would their alcohol concentration have been at the time of driving?

Appellant contends that the fact that the subject in the hypothetical was "eliminating alcohol from [his] system during that time" was not in evidence. We find that this fact was indeed in evidence, however, based on Frommhold's expert testimony that the human body eliminates alcohol after it is introduced to the system at a rate of approximately one drink per hour.

In its second hypothetical, the State asked Frommhold to assume that the subject had consumed his last drink fifteen minutes before he was stopped by the police. In this hypothetical the State did in fact ask Frommhold to assume a fact which was not in evidence because there was no testimony as to when appellant had his last drink prior to being stopped. Nevertheless, when a hypothetical question is addressed to an expert witness, the assumptions on which the hypothetical is based are not necessarily limited to those assumptions which are supported by the evidence. *Pyles v. State,* 755 S.W.2d 98, 118 (Tex.Crim.App.1988). Hypothetical questions may also include assumptions based on facts that are within the personal knowledge of the witness or that are assumed from common or judicial knowledge. *Id.* Further, counsel may propound hypothetical questions which assume facts in accordance with his theory of the case. *Id.* We hold that the State's hypothetical concerning this fifteen minute span of time was consistent with the State's theory that appellant had been drinking prior to the time that he drove his car. Thus, we overrule appellant's fifth point of error.

In appellant's sixth point of error, he argues that Frommhold should not have been permitted to render an opinion that appellant was above a .10 at the time that he was driving his car when he had no adequate basis for forming this opinion. Specifically, Frommhold stated the following:

> I don't have any firsthand knowledge of the subject's driving so I can't give you an absolute yes or no he was not affected [by the alcohol at the time of driving], but if I am allowed to assume the information as provided in the hypothetical, then I believe it's reasonable to conclude that the individual was above .10 at the time of driving.

Rule 703 of the Texas Rules of Criminal Evidence permits an expert to give his opinion based on facts or data "perceived by or made known to him at or before the hear-

**54**

ing." In this case, *Frommhold* gave his opinion based on facts made known to him through proper hypothetical questions addressed to him at trial. These hypothetical questions were based on facts in evidence and facts derived from the State's theory of the case. Thus, as noted in our discussion of appellant's fifth point of error, Frommhold could properly give his opinion based on the facts set out in these hypotheticals. Furthermore, it is well-settled that an expert may testify as to his opinion on a matter even if it embraces the ultimate fact issue in the case. TEX.R.CRIM. EVID. 704. For these reasons, we overrule appellant's sixth point of error.

The judgment of the trial court is affirmed.

As to point of error 4, O'NEILL, J., concurs in the result only.