

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-13-00258-CR

DESMOND DEWAYNE JACKSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 08-0075-X

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

# OPINION

During jury selection in Desmond DeWayne Jackson's trial for aggravated robbery of a Marshall grocery store, counsel made six *Batson*[1] challenges, all of which were overruled by the trial court. The trial court's ruling on four of these challenges forms the basis, in part, for Jackson's appeal. Jackson also complains of the trial court's refusal to grant a mistrial as a result of certain unsolicited witness testimony given in violation of a suppression order. The jury found Jackson guilty and assessed a sentence of thirty years' imprisonment.[2] Because (1) Jackson's *Batson* challenges were appropriately overruled and (2) the trial court did not err in denying Jackson's motion for a mistrial, we affirm the judgment of the trial court.

## I.       The *Batson* Challenge Was Appropriately Overruled

The State's purposeful use of peremptory strikes in a racially discriminatory manner violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Batson*, 476 U.S. at 89. The United States Supreme Court has outlined a three-step process for evaluating claims that the State has exercised peremptory challenges in a manner violating the Equal Protection Clause. *Hernandez v. New York*, 500 U.S. 352, 358 (1991); *Batson*, 476 U.S. at 96–98. The defendant must first make a prima facie showing that the State has exercised peremptory challenges on the basis of race. *Hernandez*, 500 U.S. at 358. Once that prima facie showing is accomplished, the burden shifts to the State to present a racially neutral reason for the challenged jury strikes. *Batson*, 476 U.S. at 97–98; *Nieto v. State*, 365

---

[1]*Batson v. Kentucky*, 476 U.S. 79 (1986).

[2]*See* TEX. PENAL CODE ANN. § 29.03 (West 2011).

S.W.3d 673, 676 (Tex. Crim. App. 2012).  Third, and finally, once the State's reason is proffered, the burden of persuasion shifts back, and the person raising the challenge must then convince the court that the reason given by the State was not race-neutral and was merely pretext for concealing discrimination.  *Batson*, 476 U.S. at 98; *Nieto*, 365 S.W.3d at 676.

Unless it is clearly erroneous, the trial court's ruling on the issue of discriminatory intent must be sustained.  *Hernandez*, 500 U.S. at 369.  Because the trial court is in the best position to determine if the State's facially neutral explanation for a peremptory strike is genuine, a high degree of deference is given to the trial court's decision in this regard.  *Nieto*, 365 S.W.3d at 676. In its evaluation, the trial court "must focus on the genuineness of the asserted non-racial motive, rather than the reasonableness."  *Id*. (citing *Purkett v. Elem*, 514 U.S. 765, 769 (1995)).  To determine whether the trial court's ruling was clearly erroneous, we examine the record to determine whether the ruling leaves us with a "'definite and firm conviction that a mistake has been committed.'"  *Guzman v. State*, 85 S.W.3d 242, 254 (Tex. Crim. App. 2002) (quoting *United States v. Fernandez*, 887 F.2d 564, 567 (5th Cir. 1989) (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985))).  The trial court's decision is not clearly erroneous if it is supported by the record, which includes the voir dire, the State's explanation for the use of a peremptory challenge, the rebuttal by appellant, and impeaching evidence.  *Camacho v. State*, 864 S.W.2d 524, 528 (Tex. Crim. App. 1993).

**A.     Jury Selection**

At the conclusion of jury selection, Jackson, who is African-American, complained that the State exercised peremptory challenges against the six African-American jurors within the

3

first thirty-two potential jurors.[3]  After finding the *Batson* challenge was warranted, the trial court heard the State's explanation regarding its use of peremptory challenges.  This appeal involves four of the six challenges.

The State explained that because the trial court denied each of its for-cause challenges against veniremembers four, five, eight, and fourteen, it was necessary to exercise peremptory challenges against each of the four veniremembers.  On appeal, Jackson complains the trial court erred in finding the single reason given by the State for excluding the four veniremembers was race-neutral.

By way of background, the indictment alleged that Jackson used a deadly weapon—a firearm—while committing robbery.  During voir dire, the State asked the panel whether (assuming Jackson had a gun with him during the robbery) the panel would nevertheless require the State to show how the gun was used in order for it to prove the deadly-weapon finding.  Several veniremembers affirmatively responded to this inquiry.

Jackson rehabilitated each veniremember who provided an affirmative response to the State's inquiry, with the exception of one.[4]  The State's referenced challenge for cause regarding veniremembers four, five, eight, and fourteen was based on the affirmative response of these panel members to the deadly-weapon inquiry.  The State explained that because each of these challenges was denied (based on rehabilitation), it exercised peremptory challenges to strike

---

[3]These potential jurors were identified as numbers two, four, five, eight, fourteen, and twenty-nine.

[4]The record reflects that each of the stricken veniremembers answered the State's query in the affirmative and was thereafter rehabilitated by the State.

4

these erstwhile objectionable panel members. The State further contended that it, likewise, struck all non-African-American individuals it unsuccessfully challenged for cause on this issue.

Following the State's proffer of the foregoing explanations for striking the four African-American panel members, Jackson pointed out that the deadly-weapon question was not well-stated and that there would be no question at trial as to the manner in which the gun was used. Although the trial court did not specifically find the State's proffered explanation was race neutral, it implicitly so found in its denial of Jackson's *Batson* challenge.

**B.      The State Provided Race-Neutral Explanations for Its Strikes**

The State articulated seemingly race-neutral reasons for striking the four veniremembers. *See Purkett*, 514 U.S. at 768 (unless discriminatory intent inherent in prosecutor's explanation, offered reason deemed race neutral). Under the prosecutor's questioning, each of the four veniremembers stated that they would require proof above and beyond the fact that Jackson had a gun with him during the robbery in order to enter a deadly-weapon finding.[5] Yet, each of these

---

[5]The veniremembers answered affirmatively to the following comments and inquiry:

> So, how do we determine if something is a deadly weapon? There's a couple of different ways in which it's done. Manner and means in which it's used. Could it cause serious bodily injury or death, or in some situations, just automatically it's a deadly weapon, okay?

> Well, I'm holding a pen. Take the top off of it, end of it is kind of pointed. Well, is this a deadly weapon? It can be, right? The manner and means in which it's used.

> But let's say this was a gun. How many people in here would say, although it's a gun, it still requires a manner and means in which it has to be used to be a deadly weapon? . . . .

> . . . .

> Well, what if -- what if I told you that the law says that doesn't matter? If it's a gun, it's a deadly weapon. Doesn't require a use or how it's used. It's just a deadly weapon right off the bat.

veniremembers was rehabilitated on this issue. There is authority to support the proposition that the expression of doubt about assessing the full range of punishment is a race-neutral reason for the exercise of a peremptory strike, even if that veniremember is ultimately rehabilitated. *Green v. State*, 839 S.W.2d 935, 939 (Tex. App.—Waco 1992, pet. ref'd); *Barron v. State*, 864 S.W.2d 189, 191 (Tex. App.—Texarkana 1993, no pet.). In *Green*, though, the prospective juror repeatedly expressed reservations about considering and assessing the maximum range of punishment. "That she was ultimately 'rehabilitated' by the defense did not mean the State had to accept her ambivalent views." *Green*, 839 S.W.2d at 939 (citing *Vargas v. State*, 838 S.W.2d 552, 555 (Tex. Crim. App. 1992)).

Here, although it does not appear that the views of the stricken veniremembers were ambivalent and all readily agreed, under questioning by the defense, that they could follow the proper instruction from the trial court, this explanation is nevertheless race neutral. Unless a

---

Does anybody disagree with that; that it still requires - - in your mind, it still requires a use, the way that it's used?

. . . .

Does anybody here feel that we're required to prove the way it's used to be a deadly weapon?

The affirmative responses to this inquiry were simply expressed in terms of a raised hand, the verbal response of "Yes," "I do," or "I agree." No follow-up questions were asked, and no strongly-held, adamant positions were taken.

Each of the stricken veniremembers was rehabilitated during Jackson's voir dire, in which Jackson explained, "Under our law, deadly weapon equals gun or something that by its manner and means and all of that other stuff that Mr. Solomon talked about. That's the definition of a deadly weapon, is a firearm or some other item." Jackson then asked, "If he gives you that instruction and says, if you found that a gun was used . . . you would find a deadly weapon was used?" Each of the stricken veniremembers simply answered "Yes" to the foregoing inquiry. There was no discussion, no follow-up questions, and no expressed strongly-held views on this issue.

discriminatory intent is inherent in the State's explanation, the reason proffered will be deemed racially neutral. *See id.* Race plays no overt role in this explanation.

### C. No Purposeful Discrimination

We next must determine whether the trial court clearly erred in failing to find purposeful discrimination in the State's use of peremptory strikes. The trial judge must evaluate the facially race-neutral reason proffered by the State to determine whether it is genuine or merely a pretext for purposeful discrimination. *Whitsey v. State*, 796 S.W.2d 707, 713 (Tex. Crim. App. 1989); *Jones v. State*, 431 S.W.3d 149, 155 (Tex. App.—Houston [14th Dist.] pet. ref'd).

"A number of factors, if present, tend to show purposeful discrimination." *Jones*, 431 S.W.3d at 155 (citing *Miller-El v. Dretke*, 545 U.S. 231, 240–63 (2005)). "The presence of any *one* of these factors tends to show that the State's reasons are not actually supported by the record or are an impermissible pretext." *Whitsey*, 796 S.W.2d at 713. One such factor is disparate treatment of veniremembers with the same characteristics or who answer a question in the same or similar manner. *See Keeton v. State*, 749 S.W.2d 861, 868 (Tex. Crim. App. 1988). Here, Jackson contends that although the State struck four African-American veniremembers for their responses to a question concerning the requirements of a deadly-weapon finding, the State failed to strike veniremember number seventeen[6] for this reason. Veniremember seventeen answered the State's query affirmatively and, like the four stricken veniremembers, was

---

[6] The record indicates that juror number seventeen was Mr. Nau. Although Jackson claims that Mr. Nau is non-African-American, this information is not reflected in the record. This assertion is not, however, contested by the State.

rehabilitated on this question. The contention that the State failed to strike veniremember seventeen is not supported by the record.

After veniremember seventeen was rehabilitated on the deadly-weapon issue, he stated later in the process that he believed that police officers are more credible witnesses. The State challenged veniremember seventeen for cause. Jackson objected, alleging the State had another reason for the challenge. When read in context, it is apparent Jackson believed the for-cause challenge to veniremember seventeen was based on the response given to the deadly-weapon issue. The trial court did not rule on the challenge at that point, but at the conclusion of the process, listed all veniremembers who were struck for cause. Veniremember seventeen was included on that list.

We find no basis for Jackson's claim of disparate treatment. The record merely reflects that veniremember seventeen was struck for cause at the behest of the State. Additionally, the remaining veniremembers who initially responded affirmatively to the State's deadly-weapon query—and who were subsequently rehabilitated—were either struck for cause or were struck by the State on peremptory challenge.[7] The record does not contradict the State's explanation for its strikes. We, therefore, cannot say the trial court clearly erred in overruling the objections to these peremptory challenges. We overrule this point of error.

---

[7]In addition to veniremembers four, five, eight, and fourteen, veniremembers who responded affirmatively to the State's deadly-weapon inquiry and who were subsequently rehabilitated included numbers thirteen, fourteen, sixteen, seventeen, twenty-five, thirty-one, forty-four, and forty-nine. Of these remaining veniremembers, numbers thirteen, seventeen, thirty-one, and forty-nine were struck for cause, while numbers fourteen, sixteen, twenty-five, and forty-four were struck by the State on peremptory challenge.

## II.     No Error in Refusal to Grant Mistrial

The trial court entered a pretrial order granting Jackson's motion to suppress, ordering the State "to refrain from directly or indirectly eliciting or attempting to elicit any in[-]court identification of the Defendant by Helene Baird."  At trial, after having been called by the State to testify, Baird explained that she is employed as an office clerk for Kroger's in Marshall.  Baird, who was working on the evening of the robbery, was in the cash office with James Roberson, a grocery manager, finishing up for the day.  As Baird was counting cash, Roberson left the office and went to the customer service counter.  After a few minutes, Baird went to the door by the service counter to locate Roberson, where she saw him holding a Western Union form.  The following exchange regarding this encounter ensured at trial:

> Q     [By the State]  And let me ask you this:  Was there anybody outside in the -- I guess the customer area?
>
> A     [By Baird]  Yeah, the -- Mr. Jackson was standing there.
>
> Q     He handed [Roberson] a note.
>
> A     Okay.

At this point, Jackson objected, reminding the court that it previously suppressed any identification testimony from Baird, who nevertheless identified Jackson.  After the trial court sustained his objection, Jackson asked that the testimony be stricken and that the jury be instructed to disregard the testimony.  The trial court granted each of these requests and instructed the jury to "please disregard the identification of Mr. Jackson in the last question . . . ."  The trial court denied Jackson's motion for a mistrial.  Jackson contends the trial court erred in this refusal.

"'Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required.'" *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007) (quoting *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)). "A trial court's denial of a mistrial is reviewed under an abuse of discretion standard and must be upheld if within the zone of reasonable disagreement." *Brooks v. State*, 420 S.W.3d 337, 340 (Tex. App.—Texarkana 2014, no pet.) (citing *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010)).

Jackson claims Baird's testimony identifying Jackson as being present in the store on the night of the robbery was so prejudicial that he could not thereafter receive a fair trial. "Instructions to the jury are generally considered sufficient to cure improprieties that occur during trial." *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (citing *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998)). We evaluate the effectiveness of a curative instruction to disregard by examining "'the nature of the [improper comment]; the persistence of the prosecutor; the flagrancy of the violation; the particular instruction given; the weight of the incriminating evidence; and the harm to the accused as measured by the severity of the sentence.'" *Searcy v. State*, 231 S.W.3d 539, 549 n.10 (Tex. App.—Texarkana 2007, pet. ref'd) (quoting *Roberson v. State*, 100 S.W.3d 36, 41 (Tex. App.—Waco 2002, pet. ref'd)).

While Baird did not testify that Jackson was responsible for the Kroger robbery, she did place him at the scene of the crime, which was no doubt prejudicial to his defense. It does not appear, however, that the State purposely elicited testimony about Jackson, as the question called for a "yes" or "no" response. Baird was never asked to identify Jackson. Further, the trial court expressly told the jury that it was to disregard Baird's statement.

10

Beyond this, we consider the weight of the incriminating evidence. Here, two additional witnesses identified Jackson as the person responsible for the Kroger robbery. Roberson testified that he and Jackson planned the Kroger robbery and that Jackson was involved in the robbery.[8] On the night of the robbery, Roberson and Baird were at the back of the store counting money. As Jackson approached the service desk, Roberson left the cash office to see who was there. He saw Jackson standing at the service desk wearing a hoodie, a baseball cap, and a wig. Jackson handed Roberson a note stating that he had a gun and directing Roberson to open the side door and remain calm. The note was part of Roberson and Jackson's plan. Roberson led Jackson into the cash office where Roberson handed Jackson money. While Jackson was attempting to disable the security camera, he (apparently accidentally) fired the gun he was holding. The bullet struck no one. After collecting the money, Jackson ran out the door.

Robert Blaylock, who currently lives in Atlanta, Georgia, has known Jackson since childhood. Blaylock testified that Jackson came to visit him during the first part of 2008. During that visit, Jackson told Blaylock that he robbed the Kroger store in Marshall. Jackson related to Blaylock that he wore a wig and a hat during the robbery and that the robbery was an inside job he performed together with one of the store managers. Jackson told Blaylock that the manager gave him the money and that he fled the scene. Blaylock received a small cash reward—approximately $300.00—for information provided to law enforcement on the Kroger robbery.

---

[8]After entering an open plea of guilty to the charge of aggravated robbery, Roberson received eight years' community supervision for his role in the robbery. Roberson did not receive anything in exchange for his testimony.

In addition, the bullet and bullet casing recovered from the Kroger store were identified as having been fired from the gun recovered from Jackson's residence. Finally, DNA evidence taken from the hat worn during the robbery linked Jackson to the robbery. DNA analysis revealed that 99.98 percent of the population could be excluded, while Jackson was within the 0.02 percent that could not be excluded.

For this crime, Jackson was sentenced to thirty years' incarceration. The offense of aggravated robbery is a first degree felony. TEX. PENAL CODE ANN. § 29.03(b). First degree felonies are punishable by a term of life imprisonment, or any term of imprisonment of not more than ninety-nine years or less than five years. TEX. PENAL CODE ANN. § 12.32(a) (West 2011). In this case, the minimum sentence Jackson could have received was fifteen years due to a previous adjudication for the offense of attempted aggravated robbery, to which Jackson pled true and for which Jackson was committed to the Texas Youth Commission under Section 54.04 of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 54.04 (West 2014).

Given the facts that the State did not intentionally seek identification testimony from Baird, the incriminating evidence was strong, and the sentence was relatively light and within the applicable sentencing range, we believe the curative instruction to disregard Baird's testimony was sufficient to cure the effect of Baird's improper testimony. This is not an extreme case in which it appears that the improper evidence was clearly calculated to inflame the minds of the jury, and the conduct was not such as to suggest the impossibility of withdrawing the impression on the juror's minds. *See Owens v. State*, 381 S.W.3d 696, 707 (Tex. App.—Texarkana 2012, no

pet.) (citing *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000) (per curiam)). We overrule this point of error.

## III. Conclusion

We affirm the trial court's judgment.


Bailey C. Moseley
Justice

Date Submitted:     August 1, 2014
Date Decided:       August 14, 2014

Publish