

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-22-00092-CR

_____

MELVIN FORD, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 85th District Court
Brazos County, Texas
Trial Court No. 21-01825-CRF-85

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

A Brazos County[1] jury convicted Melvin Ford, Jr., of unlawful possession of a firearm by a felon.[2] Ford appeals, complaining that (1) the trial court erred by denying Ford's *Batson*[3] challenge to the State's use of a peremptory strike, (2) law enforcement officers lacked reasonable suspicion to detain Ford, and (3) the trial court erred by denying Ford's request to instruct the jury not to consider any illegally obtained evidence.

Because we find that (1) the trial court properly denied Ford's *Batson* challenge, (2) officers had reasonable suspicion to detain Ford, and (3) Ford was not entitled to the requested jury instruction, we affirm the trial court's judgment.

## I. Background

At 3:41 a.m. on March 5, 2021, Bryan, Texas, police officers responded to a call of a sexual assault in progress. The caller told dispatch, "He's raping me!" Sergeant Scott Jones testified[4] that he and his partner received no other details besides the location of the incident. Due to the hour and location, Jones did not expect the amount of traffic they encountered.[5] Jones testified, "There were people and there were vehicles in the roadway." He also stated, "[I]t

---

[1]Originally appealed to the Tenth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We are unaware of any conflict between precedent of the Tenth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[2]*See* TEX. PENAL CODE ANN. § 46.04 (Supp.).

[3]*Batson v. Kentucky*, 476 U.S. 79 (1986).

[4]Jones's testimony was essentially the same at the hearing on Ford's motion to suppress and at trial.

[5]Because they were responding to a reported sexual assault, Jones said he was "looking for two people; maybe somebody intervening -- a good Samaritan intervening."

was a larger commotion than I expected to see for that type of call." Jones said that at least two vehicles were in the street, others were parked, and "there were some people milling around."

According to Jones, the emergency lights on the officers' vehicles were flashing when they arrived at the scene. The recording from Jones's body cam was played for the jury. The recording reveals that Jones announced, "[S]top, police," as soon as he got out of his police vehicle. A sports-utility vehicle (SUV) drove in front of Jones and then stopped. Jones rounded the SUV, and a suspect, eventually shown to be Ford, was seen behind a pickup truck. Jones told him to stop and keep his hands where Jones could see them. At first, Ford complied, quickly raising his hands above his head. After about a second or two, Ford's hands went down to his side or into the bed of the truck. Ford ignored Jones's commands to keep his hands visible. About four seconds later, Ford ran away. He was pursued by Jones and another responding officer. Within fifteen seconds, Ford was tackled by the other officer. After resisting and struggling, three officers finally subdued Ford, who had a pistol on his hip. It was proved at trial that Ford was a convicted felon at the time of the incident. Those facts led to Ford's conviction for unlawful possession of a firearm by a felon.

## II.    The Appellant Did Not Show a *Batson* Violation

After voir dire, Ford claimed that the State used one of its peremptory strikes against an African American venireperson, in violation of *Batson*. The State responded that Ford failed to make a prima facie showing of that alleged violation. The trial court overruled Ford's argument.

## A. Standard of Review

Use of peremptory challenges to strike potential jurors on the basis of race is prohibited by both the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV, § 1; *see Batson*, 476 U.S. at 85–86, and Article 35.261 of the Texas Code of Criminal Procedure, TEX. CODE CRIM. PROC. ANN. art. 35.261. If the defendant suspects the State of making race-based challenges, he may request a *Batson* hearing. *See* TEX. CODE CRIM. PROC. ANN. art. 35.261(a).

Courts use a three-step process in determining *Batson* challenges. *Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008); *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App. 2009) (per curiam). Initially, the defendant must present a prima facie case that the State exercised its peremptory challenges on the basis of race. *Snyder*, 552 U.S. at 476; *Young*, 283 S.W.3d at 866. The State must then articulate a race-neutral explanation for its challenged strikes. *Snyder*, 552 U.S. at 476–77; *Young*, 283 S.W.3d at 866. A race-neutral explanation is one "based on something other than the race of the juror." *Hernandez v. New York*, 500 U.S. 352, 360 (1991). If no discriminatory intent is inherent in the explanation, then the reason is deemed race neutral. *Id.* The defendant may rebut the State's explanation, but the burden of proving purposeful discrimination remains with the defendant. *Young*, 283 S.W.3d at 866. In the final step, the trial court must determine whether the defendant "has carried his burden of proving purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam); *Hernandez*, 500 U.S. at 359; *Young*, 283 S.W.3d at 866.

In reviewing a *Batson* ruling, we consider the record "in the light most favorable to the trial court's ruling." *Young*, 283 S.W.3d at 866. The trial court's decision will not be disturbed unless it is clearly erroneous. *Hernandez*, 500 U.S. at 369; *Young*, 283 S.W.3d at 866; *Jackson v. State*, 442 S.W.3d 771, 774 (Tex. App.—Texarkana 2014, no pet.). To determine whether the trial court's decision was clearly erroneous, we examine the record to see whether we are left with a "definite and firm conviction that a mistake has been committed." *Guzman v. State*, 85 S.W.3d 242, 254 (Tex. Crim. App. 2002) (quoting *United States v. Fernandez*, 887 F.2d 564, 567 (5th Cir. 1989) (per curiam)). The trial court is in the best position to determine whether the State's race-neutral explanation is genuine, so we defer to its ruling barring exceptional circumstances. *Nieto v. State*, 365 S.W.3d 673, 676 (Tex. Crim. App. 2012). The trial court "must focus on the genuineness of the asserted non-racial motive, rather than the reasonableness." *Jackson*, 442 S.W.3d at 774 (quoting *Nieto*, 365 S.W.3d at 676). In our review, we "consider the entire record of the voir dire," and we are not limited to "the specific arguments brought forth to the trial court by the parties." *Nieto*, 365 S.W.3d at 676 (citing *Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008)).

We do not substitute our judgment for the trial court's when considering whether the State's explanation was a pretext. *Id.* Like the trial court, we consider the genuineness, not the reasonableness, of the proffered non-racial explanation. *Id.* (citing *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004)).

5

**B. Events at Voir Dire**

After the parties conducted voir dire of the venire panel and executed their peremptory strikes, Ford claimed that the State struck "Juror No. 9,"[6] an African American, in violation of *Batson*. The State responded that another African American, "Juror No. 16," was on the jury and argued that Ford had not made a prima facie showing of an alleged *Batson* violation. Ford disagreed, stating, "If I make a *Batson* challenge, Judge, and challenge the reason for their strike, they've got to make some explanation that the strike was for something other than race." The trial court seemed to agree with the State, saying, "Got to make a prima facie showing. I don't think the mere fact of race [is sufficient]." The State cited a case and told the trial court, "[T]here are two people within the strike zone that by their physical appearance appear to be African-American; one was struck, one is on the jury." A brief argument ensued. Ford claimed that the State must offer a race-neutral explanation for its peremptory strike of an African American. The State repeated that Ford had not made an adequate prima facie showing to support his alleged *Batson* violation. The trial court then overruled Ford's *Batson* challenge. Ford offered no further argument or any offer of proof.

**C. Analysis**

"[T]he United States Constitution is offended by so much as a single strike exercised on the basis of race." *Linscomb v. State*, 829 S.W.2d 164, 166 (Tex. Crim. App. 1992). When Ford claimed a *Batson* violation to the trial court, he then bore the burden of making a prima facie

---

[6]Although "Juror No. 9" did not in fact sit on the jury, we use the identifications used by the trial court and the parties for convenience and to protect the veniremembers's and juror's privacy.

case that the State improperly used peremptory strikes to exclude African Americans from the jury. A defendant makes a prima facie case by:

> 1. showing he is a member of a cognizable racial group, and the prosecutor has exercised peremptory challenges to remove from the venire members of his race;
>
> 2. relying on the fact that peremptory challenges constitute a jury selection practice that permits discrimination; and
>
> 3. showing these facts and other relevant circumstances which raise an inference that the prosecutor peremptorily struck veniremembers on account of their race.

*Young v. State*, 826 S.W.2d 141, 145 (Tex. Crim. App. 1991) (citing *Batson*, 476 U.S. at 96–97). The prima facie case is not made merely by arguing that a member of a cognizable racial group was struck when a member of the same group is seated on the jury.

For example, in *Aguilar v. State*, 826 S.W.2d 760 (Tex. App.—Fort Worth 1992, pet. ref'd), the Hispanic defendant complained of the State's use of two peremptory strikes on veniremembers with Hispanic surnames. One Hispanic made it to Aguilar's jury, the State struck one, another was not challenged, and the fourth was found to not have been Hispanic, but simply to have had a Hispanic married surname. *Id.* at 762–63. The Fort Worth Court of Appeals held that the State's peremptory strike of one of three Hispanics did "not by itself establish a prima facie case absent any other evidence being proffered" and that "Aguilar failed to show any pattern or any other evidence to the trial court which would raise an inference that

the prosecutor used peremptory strikes to remove" the struck venireperson "on account of her race." *Id.* at 763.[7]

The Fourteenth Court of Appeals reached a similar result in *Held v. State*, 948 S.W.2d 45 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd). There, the Caucasian defendant made a *Batson* challenge after the prosecution struck the only remaining African American from the venire. *Id.* at 48.[8] The court of appeals pointed out that Held's appellate argument was the same he made to the trial court—that the prosecution "struck one hundred percent of the African American veniremembers on the panel." *Id.* at 49 (footnote omitted).

> While this statistic, on its face, might appear compelling, the actual facts before the trial court when it ruled on appellant's prima facie case were far less so. Here, the judge witnessed the State's exercise of one of its three peremptory strikes against an African American in a case where the defendant was white and race was completely unrelated to the issues in the case. The fact that the State exercised its strike in such a manner that it effectively eliminated all the members of a particular race from the jury panel is far less significant when the number stricken constitutes a grand total of one.

*Id.* We contrast this analysis with that in *Linscomb v. State*, 829 S.W.2d 164 (Tex. Crim. App. 1992), where the State struck four of six African Americans on the venire.

In *Linscomb*, the Texas Court of Criminal Appeals found that the court of appeals had erred in finding that the defendant failed to make a prima facie showing of a rational inference

---

[7]*See also Hatchett v. State*, 930 S.W.2d 844, 847 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) (insufficient data "to perform a statistical analysis of the appellant's *prima facie* case" where the record only showed that four African American veniremembers were struck, there was no evidence reflecting "the race of the venire members challenged for cause or of the venire members peremptorily challenged by appellant," and appellant "offered no other facts or circumstances which would give rise to an inference of purposeful discrimination").

[8]"Only two African American veniremembers were within the strike range. . . . One of them was successfully challenged for cause, and appellant stipulated that there was no racial motivation for this particular challenge." *Held*, 948 S.W.2d at 47–48.

that the State violated *Batson* when it struck four of the six African Americans on the venire (two African Americans were seated on the jury). *Id.* at 166. The Texas Court of Criminal Appeals pointed out that the prosecution used forty percent of its peremptory strikes—four of ten—on African American veniremembers, where African Americans comprised only nineteen percent—six of the first thirty-two members—of the venire panel.

Because the appellant in *Held* was of a different race than the struck venireperson, that is a significant distinction from Ford's situation.[9] However, Ford's case is similar to that in *Aguilar*. And, as in *Aguilar* and *Held*, Ford offered no argument and pointed to nothing else in the record to support his blanket allegation that a *Batson* violation had occurred.[10] The situation at bar is also distinguishable from that in *Linscomb*, where substantially more strikes were used against African American veniremembers. Here, only one peremptory strike was used against a member of Ford's race, and one other African American was not struck and served on the jury. The record shows that there were two African Americans on the venire—one was sat as a juror, and the other was struck by the State. The trial court could have found that those were not "circumstances which fairly raise[d] an inference of racial motivation." *Id.* at 167.

As a result, we cannot say that the trial court's ruling on Ford's *Batson* allegation was clearly erroneous. We, therefore, overrule Ford's first point of error.

---

[9]The court in *Held* observed that "where racial identity between the party asserting *Batson* and the stricken veniremember exists, 'it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred.'" *Held*, 948 S.W.2d at 50. "Therefore, although racial identity between the challenger and the excused veniremember is not required to raise a *Batson* challenge, the absence of such an identity can certainly impact the strength of the challenger's prima facie case of racial discrimination." *Id.*

[10]"*Batson* is not a talisman, the invocation of which automatically raises an inference of racial discrimination." *Bean v. State*, 816 S.W.2d 115, 119 (Tex. App.—Houston [14th Dist.] 1991, no pet.).

**III.    The Trial Court Did Not Err In Denying Ford's Motion to Suppress**

Ford's second point of error complains that officers lacked reasonable suspicion to detain him at the scene.  We disagree.

"Under the Fourth Amendment, a warrantless detention of the person that amounts to less than a full-blown custodial arrest must be justified by a reasonable suspicion." *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011).  "[T]he relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular types of noncriminal acts." *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997).

Reasonable suspicion to conduct an investigative detention must be "founded on specific, articulable facts which, when combined with rational inferences from those facts, would lead the officer to conclude that a particular person actually is, has been, or soon will be engaged in criminal activity." *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010).  "Articulable facts must amount to 'more than a mere inarticulate hunch, suspicion, or good faith suspicion that a crime was in progress.'" *Id.* (quoting *Williams v. State*, 621 S.W.2d 609, 612 (Tex. Crim. App. [Panel Op.] 1981)).

> This standard is an objective one that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was an objectively justifiable basis for the detention.  It also looks to the totality of the circumstances; those circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified.

*Derichsweiler*, 348 S.W.3d at 914 (footnotes omitted) (citations omitted).

Ford essentially ignores the fact that, within seconds of being addressed by Officer Jones and initially complying with Jones's commands, Ford ran from the scene.  "Headlong flight—

10

wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). In *Wardlaw*, officers were conducting a drive-through of "an area known for heavy narcotics trafficking in order to investigate drug transactions." *Id.* at 121. As officers drove through the area, they observed Wardlaw holding "an opaque bag," and when he "looked in the direction of the officers," he fled, running through an alley. *Id.* at 122. Wardlaw challenged the trial court's finding that officers had reasonable suspicion to detain him. *Id.* The United States Supreme Court rejected that argument. While Wardlaw's flight was "not necessarily indicative of wrongdoing . . . it [wa]s certainly suggestive of such." *Id.* at 124. In such a situation, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Id.* at 125. The Supreme Court found that the officer was "justified in suspecting Wardlaw was involved in criminal activity, and therefore, in investigating further." *Id.*

Here, officers responded to an anonymous call alleging a sexual assault. They encountered substantially more foot and vehicle traffic than expected. As Jones took steps to control the scene, Ford complied with Jones's command to stop and raise his hands. Ford then disobeyed Jones's commands by lowering his hands, and he appeared to be reaching for something in the bed of the truck in front of him or perhaps on his person. Then he ran from the scene. Under those circumstances, the officers had reasonable suspicion that Ford had just been, was, or was about to be involved in criminal activity. They had reasonable suspicion to pursue and detain Ford. The discovery of a pistol in Ford's possession was therefore lawful, and the

11

trial court did not err in denying Ford's motion to suppress evidence. For these reasons, we overrule Ford's second point of error.

## IV.     Ford Was Not Entitled to an Article 38.23[11] Instruction

In his third point of error, Ford complains that the trial court should have instructed the jury, pursuant to Article 38.23 of the Texas Code of Criminal Procedure, that the jury should not consider any evidence it found to have been obtained in violation of the laws or either the Texas or United States Constitution.

To be entitled to a jury instruction under Article 38.23(a) of the Texas Code of Criminal Procedure, "(1) [t]he evidence heard by the jury must raise an issue of fact; (2) [t]he evidence on that fact must be affirmatively contested; and (3) [t]hat contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the evidence." *Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007). "There is, of course, nothing to instruct the jury about if the suppression question is one of law only, and there is nothing to instruct the jury about unless there is affirmative evidence that raises a contested fact issue." *Holmes v. State*, 248 S.W.3d 194, 199 (Tex. Crim. App. 2008).

Ford argues that the only evidence before the jury "was that he was near an address where an anonymous report of a crime was made" and that the responding police officers "had no description of a suspect or a vehicle and they did not confirm any of the anonymous caller's information." Ford ignores, though, evidence that he then disregarded Jones's instructions by

---

[11]*See* TEX. CODE CRIM. PROC. ANN. art. 38.23.

lowering his hands and then running from the scene. That evidence was uncontroverted. Ford directs us to nothing in the record that would create a contested fact issue.

Moreover, as we discussed above, the officers' detention of Ford was supported by reasonable suspicion. Officers responded to an alleged crime scene, which led to contact with Ford. Ford complied with Jones's commands but then disregarded those instructions and ran away. Under those circumstances, the officers had reasonable suspicion that Ford had just been, was, or was about to be involved in criminal activity. They had reasonable suspicion to pursue and detain Ford. Because Ford offers no controverting facts about his detention that led to the discovery of a firearm in his possession, the officers' reasonable suspicion is a question of law. *See Robinson v. State*, 377 S.W.3d 712, 719 (Tex. Crim. App. 2012). Thus, he was not entitled to an Article 38.23 instruction.

For these reasons, we overrule Ford's third point of error.

## V. Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

Date Submitted: December 1, 2022
Date Decided: January 24, 2023

Do Not Publish